Dorothy GAUTREAUX, et al., Plaintiffs

v.

Moon LANDRIEU, Secretary of Department of Housing and Urban Development, et al., Defendants.

Nos. 66 C 1459, 66 C 1460.

United States District Court,
N. D. Illinois, E. D.

June 16, 1981.

Alexander Polikoff, Howard A. Learner, Chicago, Ill., for plaintiffs.

Thomas P. Sullivan, U. S. Atty., Robert Grossman, Jeffrey Jahns, Roan & Grossman, Chicago, Ill., for Illinois Housing Development Authority.

Calvin H. Hall, Gen. Counsel, Chicago Housing Authority, Earl L. Neal, Sp. Asst. Corp. Counsel, Chicago, Ill., Gary Ratner, Gen. Counsel, Dept. of Housing and Urban Development, Washington, D. C., Patrick W. O'Brien, Mayer, Brown & Platt, Chicago, Ill., for Chicago Housing Authority.

Richard Flando, Acting Regional Counsel, Dept. of Housing & Urban Development, Chicago, Ill., for HUD.

Stanley J. Garber, Corp. Counsel, Chicago, Ill., for City of Chicago.

## MEMORANDUM OPINION AND ORDER

CROWLEY, District Judge.

This complex litigation began in 1966 when plaintiffs, approximately 43,000 black tenants of and applicants for public housing, brought this action against the Chicago Housing Authority (CHA). Plaintiffs alleged that the CHA violated their rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981 et seq., and the equal protection clause of the fourteenth amendment by choosing project sites in exclusively black neighborhoods and creating racial quotas to limit the number of black families in white projects. This court found that CHA had deliberately engaged in discriminatory tenant-assignment and site-selection procedures. CHA was ordered to use its best efforts to increase the supply of low-rent public housing in predominantly white neighborhoods and, thus, eliminate existing patterns of residential separation of the races. *Gautreaux v. CHA*, 296 F.Supp. 907 (N.D.Ill.1969).

Unfortunately, efforts to realize the benefits of the judgment order have been continually impeded by protracted post-judgment litigation. The supplemental order entered in July, 1969 contained a comprehensive plan designed to remedy the effects of and prevent the continuation of CHA's unconstitutional procedures by enjoining further construction of public housing in non-white areas without simultaneous construction in white areas. The supplemental order specifically enjoined: 1) further construction of public housing in non-white areas unless there was simultaneous construction of at least 75 percent of all proposed units in Chicago's white areas; 2) concentration of large numbers of dwelling units in or near a single location; and 3) dwelling units designed for occupancy of more than 240 persons.[1] This supplemental

---

1. The order contemplated that, on a general basis, no public housing project would contain

dwelling units designed for occupancy by more than 120 people. It provided, however, that

order, along with other supplemental orders, were unsuccessfully appealed to the Seventh Circuit and the United States Supreme Court. *See Gautreaux v. Chicago Housing Authority*, 265 F.Supp. 582 (N.D. Ill.1967) (tenants have the right to maintain an action alleging that housing is being administered in a racially discriminatory manner); *Gautreaux v. Chicago Housing Authority*, 265 F.Supp. 582 (N.D.Ill.1967) (evidence established that CHA intentionally chose sites and adopted tenant assignment procedures for the purpose of maintaining existing patterns of residential separation of the races); *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736 (N.D. Ill.1969) (supplemental judgment order ordering that no public housing be developed in census tracts with more than 30% minority population); *Gautreaux v. Chicago Housing Authority*, 436 F.2d 306 (7th Cir. 1970); *cert. denied*, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971) (no abuse of discretion, a year after original order entered, to impose deadlines for submissions to plan commission and city council); *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971) (dismissal for lack of jurisdiction of a request for injunction against HUD prohibiting it from continuing to provide relief to CHA reversed); *Gautreaux v. Romney*, 332 F.Supp. 360 (N.D.Ill.1971), *rev'd* 457 F.2d 124 (7th Cir. 1972) (insufficient nexus between CHA housing program and HUD's Model Cities program to permit enjoining of Model Cities funds to Chicago because of lack of compliance with 1969 judgment order); *Gautreaux v. Chicago Housing Authority*, 342 F.Supp. 827 (N.D.Ill.1972), *aff'd sub nom., Gautreaux v. City of Chicago*, 480 F.2d 210 (7th Cir. 1973), *cert. denied*, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974) (district court ordered CHA to by-pass Chicago City Council approval for selection of sites for low rent housing); *Gautreaux v. Romney*, 363 F.Supp. 690 (N.D.Ill.1973), *rev'd sub nom. Gautreaux v. Chicago Housing Authority*, 503 F.2d 930 (7th Cir. 1974) (district court has authority to order suburban or metropolitan area relief for constitutional violations occurring within city limits); *Gautreaux v. Chicago Housing Authority*, 384 F.Supp. 37 (N.D.Ill.1974), petition for writ of mandamus denied sub nom., *Chicago Housing Authority v. Austin*, 511 F.2d 82 (7th Cir. 1975) (district court has the authority to refer the issue of intracity relief to a U.S. Magistrate to serve as a Master); *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976) (district court has the authority to undertake remedial efforts beyond the boundaries of the municipality in which the constitutional violation occurred and may, in its discretion, order metropolitan relief).

In 1966 a companion action was begun by plaintiffs against the Department of Housing and Urban Development (HUD), charging that HUD had sanctioned and assisted CHA's racially discriminatory public housing and seeking to prevent HUD from providing further assistance to CHA until these practices were eliminated. After the action was dismissed for lack of jurisdiction, the ruling was appealed. The Seventh Circuit reversed, finding that HUD was liable along with CHA for Chicago's discriminatory housing patterns because HUD knowingly acquiesced to CHA's unconstitutional procedures. The case was remanded to the district court for appropriate relief. *Gautreaux v. Romney*, 448 F.2d 731 (7th Cir. 1971). Numerous appeals followed this remand, CHA challenging this court's directives and plaintiffs opposing what they characterized as the "limited scope of relief." Thus, despite continuous litigation, numerous hearings and remedial court orders and referral to a Special Master, *see Gautreaux v. Landrieu*, 498 F.Supp. 1072 (N.D.Ill.1980), during the past twelve years, plaintiffs have yet to realize more than token relief. A proposed consent decree, negotiated between plaintiffs and HUD, which purports to be a workable plan for finally delivering to the plaintiff class the relief to which it is entitled and to which it

under unusual circumstances a housing project could be designed for occupancy by not more than 240 people. *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736, 739 (N.D.Ill. 1969).

has long been deprived, is now before the court for approval.

Some understanding of the 1969 judgment order entered against CHA is essential to an evaluation of the proposed decree because the decree alters some of the fundamental premises of the 1969 judgment order. The 1969 judgment order divided the County of Cook on the basis of census tracts into two areas: the Limited Public Housing Area and the General Public Housing Area. The Limited Area was defined as that part of Cook County composed of 30% or more non-white population; the Limited Housing Area was defined as those areas which were predominantly white. Attempting to remedy the effects of past discriminatory site-selection and tenant assignment procedures, the judgment order prohibited any development of public housing in the Limited Area without simultaneous development in the General Area. *Gautreaux v. Chicago Housing Authority*, 304 F.Supp. 736 (N.D.Ill.1969). However, Article X of the order specifically provided for modification of this prohibition to allow proposed developments designed by CHA alone or in combination with other private or public agencies. 304 F.Supp. at 741.

From 1969 to 1979 progress in providing remedial housing was negligible. In order to facilitate speedier relief, on joint motions of the parties, this court modified its previous orders and removed some of the locational restrictions for the units to be developed by CHA.

The scope of relief was also modified. In 1973, plaintiffs, discouraged by CHA's slow progress in complying with the 1969 judgment order, requested the court to order metropolitan area relief. The request was denied on the ground that relief against political entities not parties to the lawsuit would be improper. *Gautreaux v. Romney*, 363 F.Supp. 690 (N.D.Ill.1973). On appeal, the Seventh Circuit rejected the district court's reasoning that because the wrongs were committed within Chicago limits and solely against Chicago residents, plaintiffs were not entitled to metropolitan relief and held that, as a matter of law, metropolitan relief was not precluded. *Gautreaux v. Chicago Housing Authority*, 503 F.2d 930 (7th Cir. 1974). The United States Supreme Court, while affirming the Seventh Circuit's holding that federal courts have the jurisdiction to undertake remedial efforts beyond the boundaries in which the constitutional violation occurred, did not order metropolitan area relief. *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). Instead, having made it clear that both CHA and HUD had the authority to act outside Chicago city limits, the Supreme Court remanded the case for further consideration of the feasibility of metropolitan relief.

After the Supreme Court's determination that remedial efforts outside Chicago city limits were constitutional, HUD and plaintiffs voluntarily entered into a one year Letter of Understanding in which the parties agreed to investigate the possibilities of metropolitan-wide relief. In connection with its commitments under this Understanding, HUD developed a Section 8 demonstration program for about 400 class members in existing housing throughout the Chicago metropolitan area. The Leadership Council for Metropolitan Open Communities and the Fair Housing Center of the Home Investments Fund also participated in the development of this demonstration program which was extended and expanded under two later Letters of Understanding.

The proposed consent decree is an extension of the agreements under the Letters of Understanding. In sharp contrast to the 1969 judgment order entered against CHA, in which Cook County was divided into Limited and General areas, the proposed decree provides for metropolitan relief by dividing the Chicago Standard Metropolitan Statistical Area (SMSA), composed of six counties including Cook, into three areas: General, Limited and Revitalizing. Thus, under the proposed decree, the Limited Area, with more than 30% minority population, and the General Area, with less than 30% minority concentration, encompasses a much larger geographic area than the Lim-

ited and General Areas defined in the 1969 judgment order. In addition, recognizing that total relief to Gautreaux families outside the Limited Area could not be provided in the foreseeable future, the proposed decree introduces the concept of Revitalizing Areas, areas which have substantial minority population and are undergoing sufficient redevelopment to justify the assumption that these areas will become more integrated in a relatively short time. Because these areas are buffer zones between the Limited and General areas with ongoing or planned financial reinvestment by private parties, they are considered the most promising neighborhoods for racial and economic residential integration.

Other significant provisions of the proposed decree provide for: 1) placement of up to 7,100 persons in assisted units in the General and Revitalizing areas; 2) set-asides of Section 8 Contract Authority for a total of 350 new and/or substantially rehabilitated units and 150 Section 8 existing housing certificates for Gautreaux plaintiffs; 3) reservation of not less than 6% nor more than 12% of the units in each project for Gautreaux plaintiffs; 4) availability of at least $3 million in reallocated Community Development Block Grant Funds for use in the Chicago SMSA; and 5) placement through an outside contractor chosen by HUD and approved by plaintiffs.

The consent decree binds only HUD and the plaintiffs. However, during the course of this litigation additional parties defendant were named[2] and many of these defendants along with individual members of the class and other interested persons not parties to this lawsuit who claim to be affected by the decree wished to comment on whether it should be approved. A fairness hearing of several days was held after this court determined that the proposal was "within the range of possible approval." *See* Manual for Complex Litigation § 1.46 at 53–54. In evaluating the decree careful

consideration was given to all the testimony at the fairness hearing, as well as the exhibits and memoranda filed by interested parties as well as plaintiffs and defendants.

■ A proposed decree can be approved if it is fair, reasonable and adequate. Fed. R.Civ.P. 23(e). The factors to be considered in making this determination include: (1) the merits of the case balanced against the settlement offer; (2) the defendant's ability to provide relief; (3) the amount of opposition to the settlement; (4) any evidence of collusion in reaching the settlement; (5) the opinion of competent counsel; and (6) the reaction of class members to the settlement. *Armstrong v. Board of School Directors*, 616 F.2d 305 (7th Cir. 1980). In approving or rejecting the settlement the district court must specifically state the reasons for its decision. 616 F.2d at 315.

The objectors include the Illinois Housing Development Authority (IHDA), neighborhood organizations objecting to the concept and application of the designation of Revitalizing Areas, and individual class members. The merits of these objections will be considered in turn.

Initially IHDA challenges the propriety of the negotiations leading up to the proposed decree and suggests that its proponents intentionally excluded affected parties from the negotiations until the decree was completed. Relying on *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106 (7th Cir. 1979), IHDA argues that because the proponents improperly negotiated the settlement they bear the heavier burden of establishing fairness by clear and convincing evidence. IHDA objects to the haste with which the decree was negotiated. It claims that this haste coupled with the fact that the proposed decree binds only two parties to this litigation and will not dispose of the case gives an appearance of impropriety and, thus, demands stricter scrutiny to insure that

---

**2.** The Housing Authorities in the six-county Chicago SMSA, the Illinois Housing Development Authority, the Northeastern Illinois Planning Commission and the Director of the Department of Local Government Affairs of Illinois were added as additional parties. Plaintiffs have stated that these defendants will be voluntarily dismissed if the court approves the consent decree.

there was no collusion. IHDA's contentions do not withstand analysis.

█ There is no evidence of collusion compelling the imposition of a higher standard. IHDA's reliance on *General Motors* is misplaced for the situation there is vastly different in three respects. First, in *General Motors* the Seventh Circuit found that the district court, in evaluating the settlement, proceeded under the assumption that the negotiations leading up to the settlement proposal were irrelevant to the issue of fairness. However, while reversing the trial court's order of approval, the *General Motors* Court unequivocally stated that "[w]e do not hold that irregular settlement negotiations may never form the basis for a judicially acceptable class action settlement." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1131 (7th Cir. 1979). Thus, irregular negotiations without more, do not render a decree unfair, unreasonable or inadequate. Secondly, in *General Motors*, the judge prohibited discovery of the settlement negotiations and severely limited questioning about the negotiations at the fairness hearing. Finally, the *General Motors* court made a finding that there had, in fact, been "irregular" negotiations.

In contrast, at no time has this court intimated that the manner or methods of negotiations are irrelevant to an evaluation of the decree. Additionally, there is no evidence that the negotiations which led to the proposed decree have been irregular, nor has there been an aura of secrecy surrounding the negotiations. The settlement negotiations were announced and the proponents agreed to consult with interested parties before submitting the decree for court approval. The proponents also explained that the haste with which the decree was negotiated was due to the impending change in HUD's national administration and a desire to complete negotiations and the fairness hearing while the HUD counsel most intimately familiar with the case would still be able to participate. There has been no impropriety.

█ IHDA's substantive objections are the next considerations. Essentially IHDA challenges the decree on the grounds that it impermissibly extends HUD's authority and attempts to preempt the power of local governmental units. IHDA objects to several of the limitations on new construction. In particular IHDA objects to the reservation requirement and to the imposition of a 100-unit maximum and 10%—3 bedroom requirement per development. It contends that these restrictions will hurt the production of housing and create numerous unresolved operating conflicts for IHDA and its developers.

The specifics of the decree are, to a large extent, merely extensions of the Letters of Understanding that have proved workable for the past four and a half years. IHDA contends that neither plaintiffs nor HUD are able to rebut any of the "well-considered opinions" of IHDA's expert witnesses. Yet IHDA has failed to establish that its "well-qualified experts in urbanology" have any greater or more accurate understanding of the problems surrounding implementation of this decree than the proponents who have been intimately involved with the case since its inception.

Secondly, since IHDA is not legally bound to participate in the Section 8 program if it does not want to comply with HUD requirements it is difficult to see how HUD is infringing upon local governmental authorities. Nothing in *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1975) or *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973) compels a different conclusion, for those cases merely delineate what conduct HUD cannot adopt. HUD may not, under *Hills*, "force suburban governments to submit public housing proposals to HUD nor displace the rights and powers accorded local government entities under federal or state housing statutes . . ." 425 U.S. at 306, 96 S.Ct. at 1550. Nor, may it, under *Otero*, ignore its own implementation regulations. IHDA has failed to show that under the proposed decree HUD would be violating the mandates of *Hills* or *Otero*. HUD is not preempting IHDA's authority by exercising its

discretion to award funds to authorities which comply with imposed restrictions designed to provide Gautreaux relief or violating its own regulations because the regulations give HUD express discretion with respect to applications for its funds. See 24 CFR Part 883 et seq.

■ The second group of objectors are neighborhood organizations or Uptown, Hyde Park, and Census Tract 101, which is a portion of Rogers Park. These organizations object to the designation of their neighborhoods as Revitalizing. On the other hand, a fourth neighborhood, Lawndale, objected to the failure to designate only a small portion of it as Revitalizing. The objections of Lawndale, however, have become moot, because at the end of the fairness hearing the proposed consent decree was amended to add five more census tracts in Lawndale to the Revitalizing Area classification.

Objectors from Uptown, Hyde Park, and Rogers Park challenge the designation Revitalizing, contending that because it is vague and arbitrary, it is impossible to determine whether application of the designation to a particular area is appropriate. Several of the organizations contend that their neighborhoods are not properly designated Revitalizing and fear that there will be an over-concentration of public housing in their area if assisted housing is developed in areas which are still in an economically deprived and physically deteriorating state. Finally, other neighborhood organizations, such as the Rochelle Group of plaintiffs, fear that the restrictions on construction in the decree will cause massive displacement of residents when overcrowded units are replaced with units that comply with the HUD occupancy guidelines.

Several factors support the validity of the Revitalizing Area concept. First, the judgment order originally entered contemplated continued construction of public housing in minority areas. The ratio of housing which could continue to be developed in minority areas compared to public housing developed in the General Areas has been continually revised over the past years. The concept of the Revitalizing Area incorporates the idea of ratios, but seeks to direct the development of public housing in those areas which have the greatest potential for integration and redevelopment. At the same time the decree seeks to insure that the residents who now live in these Revitalizing Areas will not be displaced. Next, as the proponents of the decree emphasize, the Revitalizing Areas are neighborhoods with a substantial minority population where there is visibly physical redevelopment, the kind of development which attracts a white population and can foster ultimate racial integration. Finally, the construction limits prevent an over-concentration of public housing.

The concept of the Revitalizing Area has been criticized for being too indefinite and lacking objective standards. Those criticisms ignore the fact that ten criteria were developed and applied in identifying Revitalizing Areas. An area may be designated as a Revitalizing Area if it is: 1) undergoing visible redevelopment or evidences impending construction; 2) located along the lakefront, 3) scheduled to receive Community Development Block Grant Funds; 4) accessible to good transportation; 5) an area with a significant number of buildings already up to code standards; 6) accessible to good shopping; 7) located near attractive features, such as the lake or downtown; 8) free of an excessive concentration of assisted housing; 9) located in an area which is not entirely or predominantly in a minority area and 10) not densely populated. Thus, general site and neighborhood standards have been set. Yet, at the same time flexibility has been built in, because HUD is required to evaluate the block and census tract before it approves any particular proposal.

Finally, the decree provides for continuing court jurisdiction to monitor the progress in fulfilling the decree while at the same time permitting the parties to modify the decree without resorting to judicial intervention. HUD and plaintiffs may, for example, adjust census maps to reflect demographic and composition changes in

neighborhood population but may also request judicial review if there are serious disagreements between the parties. There is a provision for judicial review in five years to insure that the provisions of the decree are being faithfully implemented and to permit any necessary modification. Judicial intervention is also provided if: 1) a substantial change in HUD's statutory authority would require the court to formulate a substitute remedy; 2) HUD decides to waive locational requirements for Section 8 housing; 3) plaintiffs object to a successor to the Leadership Council; or 4) plaintiffs object to the use of reallocated Community Development Block Grant Funds.

With respect to the designations of Uptown, Hyde Park and a small part of Rogers Park as Revitalizing Areas, the record indicates that the ten criteria were appropriately applied and that these areas have been properly designated as Revitalizing. While reasonable persons may differ as to how these criteria should be applied in a specific factual situation, the record supports the finding that the designation of these three areas as Revitalizing Areas is sound.

This court recognizes that residents of areas designated as Revitalizing are understandably concerned that continued construction and subsidizing of assisted housing in their neighborhoods will threaten what economic and social stability now exists there. However, the dangers which seem to be created by the designation of Uptown, Hyde Park and a small part of Rogers Park as Revitalizing Areas are, upon closer analysis, not the real threats they appear to be at first glance. First, designation as Revitalizing is merely the first step towards the development of public housing in the specific area. Once the area is designated, HUD must specifically, after carefully balancing the ten factors, approve the project. Additionally, the decree provides for a response to unforeseen circumstances by permitting reclassification of a project location by petitioning the court. Further, after five years the entire program is scheduled for review. The court is convinced that this decree is the best plan that has yet been designed to provide plaintiffs with the relief they so clearly deserve. Thus, while not perfect, the proposed decree is fair, reasonable and adequate.

It is important to keep in mind that all parties concerned have the same goal—a fervent desire to see the development of safe, clean public housing which not only provides relief to the plaintiff class, but furthers integrated living and urban redevelopment—in short, a plan which makes Chicago a better place for all of us to live. No consent decree can please all those who are involved; this decree, however, provides for a workable program, one which can be enacted within the foreseeable future, and will be of benefit to the entire community.

Accordingly, the court approves the proposed decree as amended.

## CONSENT DECREE

Plaintiffs filed their complaint in this action on August 9, 1966. Since that time, defendants Landrieu and the United States Department of Housing and Urban Development ("HUD"), have been substituted for their predecessors as defendants. Proceedings in this action have led to the entry of opinions and orders, including those reported at 265 F.Supp. 582 (1967), 448 F.2d 731 (1971) and 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976). On June 29, 1979, plaintiffs filed a motion requesting further relief. Inasmuch as the plaintiffs and HUD have consented to the entry of this Decree, that request is withdrawn as of the "effective date," as defined herein.

Now, therefore, upon the consent of the plaintiffs and HUD, it is hereby ordered as follows:

### 1. *Jurisdiction*

This Court has jurisdiction over HUD, Landrieu and the plaintiffs and over the subject matter of this action.

### 2. *Definitions*

For purposes of this Decree:

2.1. "Assisted housing" means non-elderly housing subsidized by HUD, directly or through a public housing agency, under the following housing programs or under any housing program enacted by Congress or established by HUD in the future for the benefit of poor persons as an addition to or alternative or substitute for such programs: Section 8 Housing Assistance Payments Program—New Construction (24 C.F.R. Part 880), Substantial Rehabilitation (24 C.F.R. Part 881), Existing Housing (24 C.F.R. Part 882, Subparts A and B), Moderate Rehabilitation (24 C.F.R. Part 882, Subparts D and E), State Housing Agencies (24 C.F.R. Part 883) and Special Allocations (known as Loan Management and Property Disposition, 24 C.F.R. Part 886); Public Housing New Construction and Acquisition, with or without rehabilitation (24 C.F.R. Part 841); Rent Supplement (24 C.F.R. Part 215); and Rental Assistance Payments Program (24 C.F.R. Part 236, Subpart D). However, no project or housing units receiving either Rent Supplement or Rental Assistance Payments in whole or in part on or before the "effective date," as defined herein, shall be deemed to be assisted housing under this Decree.

2.2. "Effective date" means the date upon which this Consent Decree is entered by the Court.

2.3. "Eligible person" means a member of a household which occupies non-elderly public housing or public housing designed for the handicapped in the City of Chicago at any time before the termination of HUD's obligations under this Decree, or a member of a household for which application for non-elderly public housing or public housing designed for the handicapped was made to the Chicago Housing Authority ("CHA") and to which CHA assigned a registration number before the effective date. However, the following shall not be eligible persons:

2.3.1. Persons not eligible for non-elderly public housing under the United States Housing Act of 1937, applicable HUD regulations and CHA rules relating to tenant income and eligibility in effect at the time "assisted housing," as defined herein, is offered to such persons under this Decree.

2.3.2. Persons who have commenced occupancy of assisted housing in the "General Area," as defined herein, or in the "Revitalizing Area," as defined herein, whether before or after the effective date, except persons whose occupancy of such housing commenced pursuant to the contracts referred to in paragraph 5.4 and is terminated by a person other than the tenant without the tenant's fault, in less than twenty-five months after commencement of occupancy. The determination of whether termination was without fault on the part of the tenant shall be made jointly by counsel for plaintiffs and counsel for HUD, or in the event of dispute, by the Court.

2.3.3. Persons who, pursuant to the contracts referred to in paragraph 5.4, are offered and refuse three opportunities to occupy assisted housing in the General Area or in the Revitalizing Area.

2.3.4. Persons identified by the "Leadership Council," as defined herein, who decline to consider the opportunities to occupy assisted housing in the General Area or in the Revitalizing Area referred to in paragraph 2.3.3 and thereafter occupy assisted housing in the "Limited Area," as defined herein.

2.4. "General Area," generally being the predominantly non-minority areas of the Chicago Standard Metropolitan Statistical Area ("Chicago SMSA"), means (a) that part of the City of Chicago which lies within the census tracts listed on Exhibit A, attached hereto, and (b) all of the Chicago SMSA outside the City of Chicago except those parts designated in Exhibit A as "Excluded from the General Area."

2.5. "Large family" means a family of five or more persons, and, when used in the phrase "units designed for large families," means units with three bedrooms or more.

2.6. "Leadership Council" means the Leadership Council for Metropolitan Open Communities, a not-for-profit Illinois corporation, and includes any successor to the

Leadership Council for Metropolitan Open Communities as a party to the contracts referred to in paragraph 5.4.

2.7. "Limited Area," generally being predominantly minority areas of the Chicago SMSA, means (a) that part of the City of Chicago which lies within the census tracts not listed on Exhibits A or B, attached hereto, and (b) those parts of the Chicago SMSA outside the City of Chicago designated in Exhibit A as "Excluded from the General Area."

2.8. "Non-elderly" when used to describe housing or housing units, means all units other than units specifically designed for elderly or handicapped households without children that consist of no more than two persons.

2.9. "Revitalizing Area," generally being areas of the City of Chicago having substantial minority occupancy and undergoing substantial physical development, means that part of the City of Chicago which lies within the census tracts listed on Exhibit B, attached hereto.

3. *Applicability*

This Consent Decree applies to members of the plaintiff class and to defendants Landrieu and HUD, including their agents, employees, successors and assigns, and to all other persons in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise.

4. *Declaration*

The Court declares and determines that metropolitan area relief is necessary under the circumstances of this case and that the provisions of this Consent Decree constitute an appropriate form of such relief. The relief to be provided by HUD under this Consent Decree shall satisfy all of HUD's remedial obligations to plaintiffs in this action, except for the obligations imposed upon HUD by the order of this Court dated September 18, 1980, and any proceeding pursuant thereto. The provisions of this Consent Decree shall supersede the provisions of any prior order other than the

order of September 18, 1980, against defendants HUD or Landrieu in this action to the extent the provisions of any such prior order are inconsistent herewith.

5. *Remedial Action*

Defendants Landrieu and HUD will take the following steps:

5.1. Following the effective date, HUD will provide assisted housing to eligible persons as set forth in this Part 5 until the number of occupancies of assisted housing units in the General Area and/or in the Revitalizing Area, pursuant to the contracts referred to in paragraph 5.4, commenced by eligible persons equals 7,100.

5.1.1. If HUD demonstrates to the reasonable satisfaction of plaintiffs' counsel that an eligible person commenced occupancy of an assisted housing unit in the General Area or in the Revitalizing Area after the effective date, but obtained such a unit through means other than said contracts, or that after the effective date an eligible person commenced occupancy of a unit in the General Area or in the Revitalizing Area under the Rent Supplement or Rental Assistance Payments programs in a housing project receiving either Rent Supplement or Rental Assistance Payments on or before the effective date, that unit will be counted as a commencement of occupancy under paragraph 5.1 like any unit provided under the contracts.

5.1.2. All assisted housing units that are made available as part of the "set-asides" established pursuant to paragraphs 5.5.2 and 5.5.3 shall, when occupied, be counted as commencements of occupancy under paragraph 5.1, whether or not occupied by an eligible person.

5.2. HUD's obligations under this Consent Decree will terminate at any time before the achievement of 7,100 occupancies that the aggregate number of assisted housing units in the General and Revitalizing Areas in which eligible persons have commenced occupancy pursuant to the contracts referred to in paragraph 5.4 has aver-

aged less than five per month for three consecutive months. However, HUD's obligations hereunder will not terminate unless during such three consecutive months an average of at least 20 units per month have been made available for occupancy by eligible persons in the General and Revitalizing Areas under the marketing arrangements referred to in paragraph 5.5, and unless no event occasioning the declaration of a state of emergency or disaster, or the equivalent, by state or federal officials in all or any part of the Chicago SMSA has taken place during such consecutive months.

5.3. Eligible persons who have commenced occupancy of an assisted housing unit made available pursuant to Part 5, but whose occupancy is terminated by a person other than the tenant without the tenant's fault in less than twenty-five months after the commencement of occupancy, shall continue to be eligible for replacement assisted housing under Part 5 of this Consent Decree. Even if the Decree is terminated pursuant to paragraph 5.1 or 5.2 hereof, HUD and the plaintiffs will make suitable arrangements to assure that these persons obtain replacement assisted housing. The provision of replacement assisted housing units to such persons or to persons excepted from ineligibility under this Decree by paragraph 2.3.2 shall not constitute a commencement of occupancy under paragraphs 5.1 and 5.2. The determination of whether termination was without fault on the part of the tenant shall be made jointly by counsel for plaintiffs and counsel for HUD or, in the event of dispute, by the Court.

5.4. Assisted housing will be provided to eligible persons pursuant to contractual arrangements as follows:

5.4.1. From the effective date of this Consent Decree through September 30, 1981, HUD will adhere to its contract with the Leadership Council, Number H–4256, dated November 11, 1977, as amended on February 1, 1979, April 1, 1979, October 1, 1979, January 1, 1980, March 1, 1980, and the Addendum thereto to be dated as of the effective date, a copy of which contract, as amended, and form of Addendum thereto, are attached as Exhibit C. HUD shall execute the Addendum in substantially the form attached as part of Exhibit C within five business days after the effective date.

5.4.2. From October 1, 1981 until HUD's obligations terminate pursuant to paragraph 5.1, 5.2, 8.1, or 8.2 of this Consent Decree, HUD will continue substantially in effect the contractual arrangements set forth in Exhibit C by timely renewals of Contract Number H–4256 with the Leadership Council for Metropolitan Open Communities, or by entering into a similar contract with another entity. All such renewals or similar contracts shall be subject to Court approval, except that HUD may change the terms of such contract in the future to the extent that HUD changes its contracting procedures generally, provided that none of the services provided for the benefit of eligible persons will be reduced or modified to their detriment without Court approval. No contract shall be entered into with an entity other than the Leadership Council for Metropolitan Open Communities, except upon HUD's determination that such entity has, among other qualifications, sufficient knowledge of the Chicago area real estate market and sufficient experience in counseling and placement, and except upon reasonable written notice to plaintiffs' counsel of the identity of such entity. If plaintiffs' counsel objects to the qualifications of, or to the likelihood of satisfactory performance by, such proposed entity within five days following receipt of such notice, HUD and plaintiffs' counsel shall promptly confer about the objection. If plaintiffs' counsel continues thereafter to object to the proposed entity, plaintiffs may, within fourteen days following such conference, present their objections to the Court. Until the dispute is resolved by the Court, no new contract shall be entered into and the then existing contractual arrangements under this paragraph 5.4 shall remain in effect.

5.5. Assisted housing to be provided pursuant to paragraph 5.4 will be supplied as follows:

5.5.1. HUD will set aside contract authority for no fewer than 150 Section 8 Existing housing units per year, commencing at the beginning of Fiscal Year 1982, for use in furnishing Section 8 Existing housing certificates to eligible persons pursuant to the contracts referred to in paragraph 5.4. The amount of such set-aside will be in addition to any such certificates not issued and therefore unutilized in any year, and in addition to any "returned" certificates issued pursuant to such contracts (whether before or after the effective date) but no longer in use by the families who received them. However, such set-aside may be reduced to the extent the aggregate amount of Section 8 Existing contract authority available to the Leadership Council at the beginning of any fiscal year from such set-aside, and from such unutilized and "returned" certificates, exceeds 360 units. During the period from July 1, 1981 through September 30, 1981, HUD will set aside contract authority for 37 Section 8 Existing housing units to be utilized in accordance with the terms of this paragraph.

5.5.1.a. The full amount of this set-aside will be in addition to the "fair share" of contract authority for assisted housing normally allocated to the Chicago SMSA pursuant to 24 C.F.R. Part 891, Subpart D, and successor regulations. HUD will not reduce the normal allocation by reason of the set-aside provided under this paragraph 5.5.1.

5.5.1.b. Any unit occupied by a different eligible person utilizing a reissued certificate will be counted as a commencement of occupancy under paragraph 5.1.

5.5.2. HUD will set aside contract authority for 250 Section 8 New Construction and/or Substantial Rehabilitation units per year commencing at the beginning of Fiscal Year 1982 for use in multifamily projects to be located in the General Area or in the Revitalizing Area and that are insured under the National Housing Act. This authority shall be used in projects that contain no more than approximately 30 units or whose sponsors agree to enter into Housing Assistance Payments contracts for not less than approximately 20% nor more than approximately 35% of the units in each such project. During the period from July 1, 1981, through September 30, 1981, HUD will set aside contract authority for 62 Section 8 New Construction and/or Substantial Rehabilitation units to be utilized in accordance with the terms of this paragraph.

5.5.2.a. The full amount of this set-aside will be in addition to the "fair share" of contract authority for assisted housing normally allocated to the Chicago SMSA pursuant to 24 C.F.R. Part 891, Subpart D, and successor regulations. HUD will not reduce the normal allocation by reason of the set-aside provided under this paragraph 5.5.2.

5.5.2.b. The Chicago Area Office of HUD will afford a priority in processing applications for mortgage insurance for all projects referred to in paragraph 5.5.2 and will accept applications from developers at any time to use the set-aside provided under this paragraph. Such proposals will not be required to compete under 24 C.F.R. § 880.307 or § 881.307, or any successor regulations, for HUD's normal "fair share" allocation of contract authority for assisted housing. However, such proposals shall comply with all other applicable regulations and processing requirements, and where units sought under proposals for this set-aside exceed the number of units available under the set-aside, the proposals shall be ranked against each other under usual HUD procedures.

5.5.2.c. Contract authority equal to any portion of the set-aside unused in any year shall be available for use in the succeeding year and shall not diminish the 250 unit set-aside under paragraph 5.5.2 to be provided in that succeeding year, unless HUD's obligations have terminated pursuant to paragraph 5.1, 5.2, 8.1, or 8.2.

5.5.3. HUD will set aside contract authority for 100 Section 8 New Construction and/or Substantial Rehabilitation units per year, commencing at the beginning of Fiscal Year 1982, for use in projects that will

increase housing choice for large minority families living in the Limited Area of the City of Chicago by providing Section 8 New Construction and/or Substantial Rehabilitation assisted housing for such families at locations in the General Area or in the Revitalizing Area accessible to public transportation. Such projects shall contain no more than approximately 30 units or sponsors of such projects must agree to enter into Housing Assistance Payments contracts for not less than approximately 20% nor more than approximately 35% of the units in each such project. During the period from July 1, 1981, through September 30, 1981, HUD will set aside contract authority for 25 Section 8 New Construction and/or Substantial Rehabilitation units to be utilized in accordance with the terms of this paragraph.

5.5.3.a. The full amount of this set-aside will be in addition to the "fair share" of contract authority for assisted housing normally allocated to the Chicago SMSA pursuant to 24 C.F.R. Part 891, Subpart D, and successor regulations. HUD will not reduce the normal allocation by reason of the set-aside provided under this paragraph 5.5.3.

5.5.3.b. If the set-aside is not fully reserved for acceptable proposals by June 30 in any year, the unreserved balance (or any portion thereof) may be made available by HUD, in its discretion, to increase the set-aside authorized under paragraph 5.5.2. Contract authority equal to any portion of the set-aside unused in any year shall be available for use in the succeeding year and shall not diminish the 100 unit set-aside under paragraph 5.5.3 to be provided in that succeeding year, unless HUD's obligations have terminated pursuant to paragraph 5.1, 5.2, 8.1 or 8.2.

5.5.3.c. The Chicago Area Office of HUD will afford a priority in processing applications for mortgage insurance for all projects referred to in paragraph 5.5.3 and will accept applications from developers at any time to use the set-aside provided under this paragraph. Such proposals will not be required to compete

under 24 C.F.R. § 880.307 or § 881.307, or any successor regulations, for HUD's normal "fair share" allocation of contract authority for assisted housing. Proposals from developers containing substantially the provisions set forth in Exhibit D hereto shall be deemed by HUD to be acceptable proposals under this paragraph. However, all proposals shall comply with all other applicable regulations and processing requirements, and where units sought under proposals for this set-aside exceed the number of units available under this set-aside, the proposals shall be ranked against each other under usual HUD procedures.

5.5.4. HUD will require that in each housing project a number of assisted housing units equal to at least 6% but not more than 12% of the total number of housing units (assisted and unassisted) for which Fiscal Year 1981, or later, contract authority is initially reserved after the effective date under any assisted housing program in the Chicago SMSA shall be made available to eligible persons through marketing arrangements set forth in Exhibit C hereto. However, the requirements of this paragraph shall not apply to public housing provided by CHA, to Section 8 Existing housing (other than Moderate Rehabilitation), or to projects receiving any Rent Supplement or Rental Assistance Payments on or before the effective date. Any fractional number of units to be provided to eligible persons shall be "rounded-up" to the next higher whole number. The number of assisted housing units required to be provided to eligible persons shall not exceed 50% of the total number of assisted housing units in the project; and at least two such units must be provided to eligible persons in any project having four or more assisted housing units.

5.5.4.a. The precise number of units in each project to be provided to eligible persons under this paragraph within the range stated shall be arranged through consultation by developers with the Leadership Council. In the case of projects using Section 8 contract authority set

aside for the Illinois Housing Development Authority under 24 C.F.R. Part 883, such arrangements shall be made through consultation by the Leadership Council with said Authority. In the case of projects funded by a local public housing agency, such arrangements shall be made through consultation by the Leadership Council with such public housing agency. All such arrangements shall take into consideration principles consistent with the objectives of this Decree and sound management of the project in question and shall be finally determined by HUD.

5.5.4.b. The units reserved for eligible persons in each project subject to this paragraph 5.5.4. shall include 50% ("rounded-up" to the next higher whole number) of the total number of assisted housing units designed for large families, including 50% of any assisted housing units having four or more bedrooms, up to the number of units required to be reserved for eligible persons in such project. HUD may not permit owners of assisted housing projects to prevent large families from leasing units designed for large families by occupancy or other standards (other than statute or ordinance) which are more restrictive than those approved by HUD for general application. The remainder, if any, of the units reserved for eligible persons, shall have at least two bedrooms.

5.5.4.c. HUD may not permit a sponsor of a project subject to this paragraph 5.5.4 to withdraw any unit then occupied by an eligible person from an assisted housing program pursuant to applicable regulations nor may HUD construe as good cause for termination of the tenancy of an eligible person the desire of a sponsor to withdraw such unit, except in each case with the consent of plaintiffs' counsel. The provision of a replacement assisted housing unit for any unit withdrawn by consent shall not constitute a commencement of occupancy under paragraphs 5.1 or 5.2.

5.6. To increase the supply of assisted housing to eligible persons, especially eligible persons constituting large families, HUD will take the following actions:

5.6.1. HUD will cause to be made available not less than $3 million of reallocated Community Development Block Grant funds for use in the Chicago SMSA and will use its best efforts to assure that such funds are used to aid in providing assisted housing outside the Limited Area for eligible persons living in the Limited Area in the City of Chicago. Not less than $500,000 of such funds shall be made available within 30 days after the effective date, and the balance shall be made available by not later than ·August 30, 1981. Ninety days after the effective date, the HUD Area Manager shall solicit applications for the use of not less than $500,000 of such funds for uses under this Decree, including proposals to establish the revolving fund referred to in Exhibit D hereto, from eligible grantees in the Chicago SMSA, including the City of Chicago, pursuant to 24 C.F.R. § 570.-107(e)(2). By not later than September 30, 1981, the Area Manager shall solicit applications for the balance of such funds from such grantees. In consultation with plaintiffs' counsel, HUD shall fund fundable applications up to the amount of the funds made available under this paragraph and shall take all necessary steps within its authority to assure that the reallocated funds made available pursuant to this paragraph are used for activities, including any of those provided for in this Decree, to aid in achieving the objectives of this Decree, subject to applicable regulations. However, if plaintiffs' counsel object to HUD's proposed funding or subsequent steps referred to above, plaintiffs may, within fourteen days following, present their objections to the Court. Until the dispute is resolved by the Court, HUD will not take any further action with respect to such applications or take such subsequent steps. HUD will consider making additional funds available to expand or otherwise aid programs carried out under paragraphs 5.5.2, 5.5.3, and 5.9 that are successful in providing assisted housing to eligible persons.

5.6.2. HUD will require that not fewer than 10% ("rounded-up" to the next higher whole number) of all assisted housing units in each Section 8 New Construction or Public Housing New Construction housing projects having five or more assisted housing units in the Chicago SMSA for which Fiscal Year 1981, or later, contract authority is initially reserved after the effective date shall be units designed for large families. However, HUD shall exempt from the requirements of this paragraph any such project utilizing a set-aside of Section 8 New Construction contract authority established by HUD for purposes of this case for use in insured multifamily projects in the Chicago SMSA, as to which an application fee for a conditional commitment for mortgage insurance is paid to HUD on or before June 30, 1981. In accordance with its regular procedures, HUD will give consideration in its processing of applications for all projects under any assisted housing program, including rehabilitation projects, (1) to achieving a greater number of assisted housing units designed for large families than that required by this paragraph, and (2) to providing contract authority for assisted units for elderly persons in a manner that may stimulate the production of assisted housing units designed for large families.

5.6.3. HUD will promptly review fair market rents for Section 8 Existing housing in the Chicago SMSA for the purpose of considering the establishment of separate fair market rents for units of three or more bedrooms in particular submarket areas, and for particular types of housing, within the SMSA in order to increase the supply of assisted housing available to large families. In the course of such review HUD will consult with and consider data submitted by the Leadership Council.

5.7. Subject to Part 8, until HUD's obligations have terminated pursuant to paragraph 5.1, 5.2, 8.1, or 8.2, HUD will not take any of the following actions in the Chicago SMSA:

5.7.1. Fund any assisted housing programs, other than public housing provided by CHA and Section 8 Existing housing, except in conformity with the provisions of Part 5.

5.7.2. Fund any assisted housing projects that do not include a sufficient number of assisted units of specified bedroom sizes to meet the requirements applicable to assisted housing units specified in paragraphs 5.5.4 and 5.6.2.

5.7.3. Fund assisted units for elderly persons in the Chicago SMSA otherwise than in conformity with 24 C.F.R. § 891.-206, or any successor regulation. HUD may depart from the provisions of such regulation if it deems that such a departure is likely to result in a higher number of non-elderly units than if such provisions were strictly applied. Funding of assisted units for elderly persons may in any event depart from such provisions if HUD is satisfied that the community in which such units are proposed to be located is making substantial progress in meeting the lower income housing needs of non-elderly families and that funding of such units conforms to any applicable Housing Assistance Plan. HUD will consult with plaintiffs' counsel if in the Chicago SMSA it proposes to (i) issue notices of fund availability for Section 8 New Construction and/or Substantial Rehabilitation housing or Public Housing which do not in any way condition the funding of elderly units upon the provision of non-elderly units or (ii) make set-asides to state housing agencies without requiring that notices of fund availability issued by such agencies condition the funding of elderly units upon the provision of non-elderly units.

5.8. Requirements for assisted housing in the Chicago SMSA will be observed in accordance with the following:

5.8.1. In any fiscal year unless otherwise ordered by the Court under paragraph 8.4, HUD will not approve housing assistance plans or approve or set aside contract authority for Section 8 New Construction or Existing (other than Moderate Rehabilitation) housing in the City of

Chicago unless (a) not less than one-third of the units of Section 8 New Construction housing and not less than one-third of the units of Section 8 Existing housing (other than Moderate Rehabilitation) within the City of Chicago are to be physically located within the General Area, and (b) not more than one-third of the units of Section 8 New Construction housing and not more than one-third of the units of Section 8 Existing housing (other than Moderate Rehabilitation) within the City of Chicago are to be physically located within the Limited Area.

5.8.2. HUD will not reserve contract authority for Section 8 New Construction assisted housing units in the General Area or the Revitalizing Area of the Chicago SMSA in any structure, or in any group of structures on the same or contiguous parcels of real estate, which:

(i) Contains more than approximately 100 assisted housing units, except that assisted housing units in a structure in which the number of such units does not exceed approximately 35% of the total number of units in such structure shall not be counted for purposes of this subparagraph (i);

(ii) Provides assisted housing units above the third story for families with children, except in a structure in which the number of assisted housing units does not exceed approximately 35% of the total number of units in such structure; or

(iii) Is to be located in any census tract if, following such location, the aggregate number of apartments and single family residences theretofore made available under any assisted housing program in such census tract would constitute more than 15% of the total number of apartments and single family residences in such census tract.

5.9. HUD will explore actively all possibilities of supplying assisted housing to eligible persons as rapidly as possible through the assisted housing programs referred to in this Consent Decree, and through any other housing and housing related programs which may be implemented by HUD at any time prior to the satisfaction or termination of HUD's obligations hereunder, including without limitation the exercise by HUD of its funding and administrative powers under the Housing and Community Development Act of 1974, as amended, except that HUD shall not be required to perform the functions of a public housing agency. HUD will use its best efforts to aid CHA to provide assisted housing under public housing programs as rapidly as possible, including without limitation (i) prompt review and processing of CHA submissions (including development programs and appraisals) to HUD, and (ii) the provision to CHA each year of contract authority for such number of public housing units as HUD determines CHA is able to utilize within a reasonable period of time.

### 6. *Annual Reports*

On or before January 2, 1982, and on or before January 2 of each year thereafter, HUD will file with the Court and serve upon the plaintiffs a report describing the activities carried out and the results achieved in providing assisted housing to eligible persons under this Consent Decree from the effective date until the September 30 preceding the date of such report.

### 7. *Exclusion of Other Proceedings*

This Consent Decree does not affect CHA's obligations under any orders entered in this action or preclude further proceedings against CHA pursuant thereto. As provided in paragraph 4, this Consent Decree does not affect HUD's obligations under this Court's Order in this action of September 18, 1980, or preclude further proceedings pursuant to that order. However, in any such further proceedings, plaintiffs shall be barred from seeking from HUD any additions or modifications to this Decree or any relief of the type specifically provided for herein.

### 8. *Retention of Jurisdiction; Waivers; Change of Authority*

8.1. Jurisdiction is retained by the Court for the purpose of enabling the plaintiffs

and HUD to apply to the Court at any time for such further orders as may be necessary or appropriate for the construction, implementation, modification or enforcement of this Consent Decree.

8.2. At any time after the fifth anniversary of the effective date, either HUD or the plaintiffs, without the consent of the other, may request the Court to review the progress made in providing assisted housing to eligible persons hereunder and, based upon such review, to modify or terminate any or all of the rights or obligations provided herein. The party seeking review will not be required to demonstrate changed circumstances to obtain such Court review.

8.3. After the availability of final 1980 census data, but not more frequently than every two years thereafter, either HUD or plaintiffs' counsel, without the consent of the other, may request the Court to modify Exhibits A and B hereto.

8.4. In any fiscal year in which HUD wishes to approve contract authority for Section 8 New Construction or Existing assisted housing that does not comply with the locational requirements of paragraph 5.8.1, HUD may petition the Court for a waiver of that provision. In requesting a waiver, HUD may ask the Court to rule that specified project locations in the Limited Area should be reclassified as part of the Revitalizing Area or the General Area, as the facts may justify, and/or that specified project locations in the Revitalizing Area should be reclassified as part of the General Area. Where the Court approves such a reclassification, the project location shall be treated as reclassified for all purposes of this Decree, and Exhibits A and B hereto shall be amended accordingly. If the Court does not approve the requested reclassification, HUD may nonetheless petition the Court to treat the location for which the waiver is sought as being in the Revitalizing Area or the General Area, as the case may be, (i) for purposes of determining the number of assisted housing units of which eligible persons have commenced occupancy under paragraph 5.1 hereof, and/or (ii) for purposes of meeting the locational requirements of paragraph 5.8.1 hereof.

8.5. In any fiscal year in which HUD wishes to approve contract authority for assisted housing that does not conform to the percentages specified in paragraph 5.5.2, 5.5.3, 5.5.4 or 5.6.2 hereof, or to the provisions of paragraph 5.7 or 5.8.2 hereof, it may approve such contract authority with the written consent of plaintiffs' counsel without obtaining an order from the Court. If plaintiffs' counsel does not consent, HUD may seek a Court Order waiving the provision in question. CHA may seek plaintiffs' counsel's consent or, where necessary, a Court order waiving any of the provisions referred to in this paragraph with respect to contract authority for public housing projects. If HUD wishes to approve contract authority that does not conform to the provisions of subparagraph (i), (ii), or (iii) of paragraph 5.8.2, it must show, with respect to subparagraph (i) or (ii), that there is no practical alternative to approving such contract authority, or, with respect to subparagraph (iii), that approving the contract authority is in the best interests of the community where the assisted housing would be located.

8.6. HUD's ability to perform any of its obligations specified in this Decree is subject to the availability of funding from Congress for any purpose for which such funding is required and to the existence of statutory authority generally authorizing acts necessary for performance by HUD. HUD shall not be held in contempt of this Court, or otherwise punished, for non-compliance with this Decree on account of failure to perform resulting from the unavailability of funding from Congress necessary for compliance, or from the modification or revocation of statutory authority necessary for compliance, or from the failure of HUD or any other person to seek such authority or funding from Congress. Notwithstanding the foregoing, if at any time before the termination of HUD's obligations under paragraph 5.1, 5.2, 8.1, or 8.2, Congress fails to appropriate funds necessary for compliance, or revokes or substantially modifies

any statutory authority of HUD necessary for compliance so as to prevent HUD from providing the relief specified in this Decree, plaintiffs shall be entitled to receive alternative relief comparable to that specified herein and consistent with HUD's revised funding or statutory authority for assisted housing. In such event, HUD and plaintiffs' counsel shall consult in an effort to agree upon a proposed modification of this Decree to provide such relief. If the parties agree upon a proposed modification, they shall promptly submit the same to the Court for approval. If after a reasonable time the parties cannot agree, the entire matter shall at the instance of either HUD or the plaintiffs be submitted to the Court for adjudication. In no event, however, shall such a revision in HUD's funding or statutory authority constitute grounds for reopening this Decree for any purpose other than providing such alternative relief comparable to that specified herein.

8.7. Where HUD has agreed in this Decree solely to consult with plaintiffs' counsel or consider or explore taking any action not specifically required hereunder, HUD shall undertake such consultation, consideration or exploration in good faith, but its failure actually to take the action which is the subject of such consultation, consideration or exploration shall not be grounds for contempt.

8.8. Nothing in this Part 8 shall be construed to prevent either HUD or the plaintiffs from opposing any application by the other to the Court for any order for the construction, implementation, modification or enforcement of this Consent Decree.

## EXHIBIT A

### CENSUS TRACT NUMBERS

| | | |
|---|---|---|
| 102 through 109 | 1801 through 1803 | 6001 through 6016 |
| 201 through 209 | 1901 through 1914 | 6101 through 6106 |
| 301 through 310 | 2001 through 2006 | 6110 through 6115 |
| 318 through 319 | 2101 through 2109 | 6201 through 6204 |
| 401 through 410 | 2201 through 2229 | 6302 through 6305 |
| 501 through 515 | 2301 through 2305 | 6307 through 6309 |

| | | |
|---|---|---|
| 601 through 634 | 2401 through 2408 | 6401 through 6408 |
| 701 through 718 | 2501 through 2505 | 6501 through 6505 |
| 801 through 802 | 3001 through 3002 | 6602 through 6606 |
| 810 through 817 | 3005 through 3012 | 6608 through 6611 |
| 901 through 903 | 3014 through 3020 | 7001 through 7005 |
| 1001 through 1007 | 3101 through 3115 | 7204 through 7205 |
| 1101 through 1105 | 3401 through 3405 | 7401 through 7404 |
| 1201 through 1204 | 5201 through 5206 | 7503 through 7504 |
| 1301 through 1305 | 5501 | 7601 through 7607 |
| 1401 through 1408 | 5605 through 5613 | 7701 |
| 1501 through 1512 | 5701 through 5705 | 8117 |
| 1601 through 1613 | 5801 through 5811 | 8209 |
| 1701 through 1711 | 5901 through 5907 | 8408 |

### EXCLUDED FROM THE GENERAL AREA

| | |
|---|---|
| 8092 | |
| 8096 | |
| 8097 | |
| 8098 | |
| 8101 | |
| 8125 | (within 1 mile of 2519 and 2521) |
| 8126 | (within 1 mile of 2519 and 2521) |
| 8127 | (within 1 mile of 2519 and 2521) |
| 8129 | (within 1 mile of 2519 and 2521) |
| 8130 | (within 1 mile of 2519 and 2521) |
| 8131 | (within 1 mile of 2519 and 2521) |
| 8132 | (within 1 mile of 2519 and 2521) |
| 8170 | (within 1 mile of 8172 and 8173) |
| 8171 | (within 1 mile of 8172 and 8173) |
| 8172 | |
| 8173 | |
| 8175 | (within 1 mile of 8172 and 8173) |
| 8176 | (within 1 mile of 8172 and 8173) |
| 8177 | (within 1 mile of 8172 and 8173) |
| 8164 | (within 1 mile of 8172 and 8173) |
| 8179 | (within 1 mile of 8172 and 8173) |
| 8180 | (within 1 mile of 8172 and 8173) |
| 8212 | (within 1 mile of 5303 or 7505) |
| 8214 | (within 1 mile of 5303 or 7505) |
| 8234 | (within 1 mile of 5303 or 7505) |
| 8235 | (within 1 mile of 5303 or 7505) |
| 8233 | (within 1 mile of 5303 or 7505) |
| 8243 | |
| 8244 | |
| 8249 | |
| 8268 | |
| 8269 | |
| 8270 | |
| 8271 | |
| 8272 | |
| 8273 | |
| 8274 | |
| 8275 | |
| 8276 | |
| 8289 | |
| 8290 | |
| 8291 | (within ½ mile of 8294) |
| 8294 | |
| 8295 | (within ½ mile of 8294) |
| 8296 | (within ½ mile of 8294) |
| 8297 | (municipality) |
| 8837 | (within ½ mile of 8294) |
| 8838 | (within ½ mile of 8294) |

CENSUS TRACT NUMBERS

| | |
|---|---|
| 8303 (within ½ mile of 8294) | |
| 8305 (within ½ mile of 8294) | |
| 8509 | |
| 8512 | 101 |
| 8623 | 311 through 317 |
| 8628 | 320 through 321 |
| 8615 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 719 through 720 |
| 8622 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 803 |
| 8624 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 809 |
| 8625 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 2317 through 2318 |
| 8626 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 2409 through 2414 |
| 8627 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 2418 through 2436 |
| 8629 | 2705 south of Harrison Street |
| 8630 (within 1 mile of 8623, 8628, 8629, 8631, 8632) | 2715 through 2716 |
| 8631 | 2801 through 2803 |
| 8632 (excluding Lake Bluff) | 2809 |
| 8807 (outside city) | 2812 through 2813 |
| 8808 | 2815 south of Harrison Street |
| 8813 | 2816 south of Harrison Street |
| 8819 | |
| 8820 | |
| 8821 | |
| 8824 | |
| 8825 | |
| 8830 | |
| 8831 | |
| 8836 (within ½ mile of 8294) | |

Right sub-column of census tracts:

2817 through 2826
2828 through 2836
2903
2904 through 2906
2911 through 2913
3301
3304 through 3305
3501 through 3503
3506 through 3510
3901 through 3907
4101 through 4114
4201 through 4204
4211
4301 through 4303
4305
4307
4309
4314
4601 through 4602
7207
7502