Dorothy **GAUTREAUX, et al., Plaintiffs,**

v.

**Samuel R. PIERCE, Secretary of Department of Housing and Urban Development, et al., Defendants.**

**Nos. 66 C 1459, 66 C 1460.**

United States District Court, N.D. Illinois, E.D.

Aug. 25, 1982.

On Motion For Reconsideration Sept. 2, 1982.

John Jensen, Regional Counsel for HUD, Chicago, Ill., for defendants.

Michael Shakman, Krupp & Miller, F. Thomas Hecht, Levy & Erens, Gerald B. Lurie, Rudnick & Wolfe, Chicago, Ill., for petitioners/intervenors.

Alexander Polikoff, Chicago, Ill., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Presently before the Court are two related motions filed by different groups of petitioners in connection with this Court's continuing jurisdiction to oversee the administration of the consent decree entered in this matter between plaintiffs and the United States Department of Housing and Urban Development ("HUD") on July 16, 1981.

Petitioners William Lavicka and Barbara Piegare have moved for the issuance of a rule to show cause why HUD should not be held in contempt of this Court for authorizing section 8 housing assistance payments to the Academy Square housing development on the Near West Side of the City of Chicago allegedly in violation of the terms of the consent decree. Alternatively, petitioners Lavicka and Piegare request leave to intervene in this matter for the limited purpose of challenging HUD's actions with regard to the Academy Square development under the consent decree.

The second group of petitioners, Eugene Heytow, Marcel Lutwak and Richard Parrillo, are the developers of the Academy Square project. They seek an order from this Court declaring that no prior court orders in this matter preclude HUD from providing section 8 housing assistance payments to the Academy Square development or preclude the Chicago Housing Authority ("CHA") or its instrumentality, the Chicago Metropolitan Housing Development Corporation ("CMHDC"), from providing financing for the construction of Academy Square.

1. Although the second group of petitioners, Heytow, Lutwak and Parrillo, technically did not seek to intervene in this matter, we believe that to be the appropriate procedural predicate for the relief they seek.

2. According to the 1980 census, there are approximately 348 dwelling units in census tract 2817. After the Academy Square development

By minute order dated August 20, 1982, this Court allowed both groups of petitioners leave to intervene for the limited purposes described above.[1] On the merits, however, the Court concluded that HUD had acted properly in authorizing section 8 contract authority for the Academy Square development. Accordingly, the Court denied the relief sought by petitioners Lavicka and Piegare, but granted the relief sought by petitioners Heytow, Lutwak and Parrillo. The rationale for our decision is set forth below.

Both groups of petitioners focus on paragraph 5.8.2 of the consent decree which provides, in pertinent part:

5.8.2. HUD will not reserve contract authority for Section 8 New Construction assisted housing units in the General Area or the Revitalizing Area of the Chicago SMSA in any structure, or in any group of structures on the same or contiguous parcels of real estate, which:

\* \* \* \* \* \*

(iii) Is to be located in any census tract if, following such location, the aggregate number of apartments and single family residences theretofore made available under any assisted housing program in such census tract would constitute more than 15% of the total number of apartments and single family residences in such census tract.

Petitioners Lavicka and Piegare maintain that HUD's reservation of section 8 authority for the 200-unit Academy Square development violates paragraph 5.8.2(iii) of the consent decree in that the 100 units of non-elderly housing included in the proposed development would exceed 15% of the total number of dwelling units in census tract 2817 (the proposed site of Academy Square) after construction of the project according to 1980 census data.[2] On the

is constructed, there will be a total of 548 dwelling units, 100 of which or 18.25% will be non-elderly assisted housing. By contrast, there were approximately 1,100 dwelling units in that census tract in 1970. HUD reserved section 8 contract authority for Academy Square on the basis of its analysis of the 1970 census data and an on-site visual inspection of the area that revealed that the housing stock in

other hand, petitioners Heytow, Lutwak and Parrillo contend that HUD properly reserved section 8 authority for Academy Square on the basis of 1970 census data and an on-site inspection of census tract 2817 for compliance with paragraph 5.8.2(iii) of the consent decree. In addition, these petitioners contend that even if HUD should have referred to 1980 census data that may have been available to it when the relevant financing decision was made, paragraph 5.8.2(iii) does not bar HUD's reservation of section 8 authority for Academy Square under the particular facts of this case.

## I.

█ Rule 24 of the Federal Rules of Civil Procedure states in pertinent part that:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In view of the rather unique set of circumstances before the Court at the present time, we conclude that both groups of petitioners should be permitted to intervene as of right pursuant to Rule 24(a) for the limited purpose of requesting that the Court determine whether or not HUD's involvement with the Academy Square development is or is not precluded by the terms of the consent decree. Both groups have a strong interest in the interpretation and construction of certain portions of the consent decree and in the provision of housing under that decree which is the subject matter of this action at the present time. Their ability to protect those interests may be impaired or impeded depending upon how this Court construes HUD's obligations under the decree, and it is apparent that those interests may not be adequately represented by existing parties.[3]

The instant circumstances are thus distinguishable from others in which the Court has refused to find that newly-filed actions involving real estate developers' due process or equal protection challenges to the actions of HUD or the City of Chicago were related to the *Gautreaux* case, filed 16 years ago by black residents of public housing, within the meaning of Local Rule 2.31.[4]  *See, e.g., Kogen v. City of Chicago,* No. 82 C 2944 (N.D.Ill. May 24, 1982); *Finger Enterprises v. Pierce,* No. 82 C 1400 (N.D.Ill. March 9, 1982). Those cases involved issues that were both narrower, in terms of the affected parties, and broader, in terms of the legal issues and requested relief, than the *Gautreaux* case. They could thus rise or fall on their own merits without much reference to the consent decree entered between HUD and plaintiffs in the instant case. By contrast, the issue raised by petitioners-intervenors in the instant setting is integrally related to and dependent upon this Court's construction and interpretation of the consent decree, a task reserved to this Court by the decree itself. *See* Consent Decree at ¶ 8.1.

---

that tract had been substantially depleted since 1970. Yet HUD still concluded that the modest Academy Square development would not violate the consent decree.

**3.** In *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972), the Supreme Court noted that "[t]he requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *See also* 3B J. Moore's *Federal Practice* § 24.09–1[4] (1969). In the instant case, we note that HUD did not seek to clarify its obligations with respect to Academy Square until after the pending motions were filed. Moreover, plaintiffs actually oppose the relief sought by petitioners Heytow, Lutwak and Parrillo.

**4.** Local Rule 2.31 provides that the judge before whom the lower numbered case of the claimed related pair is pending shall determine whether the cases are related within the meaning of the rule and should thus be heard by the same judge in order to achieve economy and efficiency for the litigants as well as the Court.

Accordingly, both groups of petitioners will be permitted to intervene in this action for the limited purposes described above. The alternative motion of petitioners Lavicka and Piegare for the issuance of a rule to show cause will be denied.

## II.

■ With respect to the merits of petitioner-intervenors' positions, the Court concludes that whether or not the 1980 census data was available to HUD at the time the decision was made in September, 1981, to reserve section 8 authority for the Academy Square development, that action does not contravene the terms of paragraph 5.8.2, and nothing in the decree or in prior orders of this Court precludes HUD, CHA or CMHDC from providing financial or other assistance for that development.[5] If, as HUD maintains, the 1980 census data was not available to the Chicago area office at the time the decision was made to reserve section 8 authority for Academy Square, then HUD officials acted properly in referring to the 1970 census data that was available at the time supplemented by visual on-site inspection of census tract 2817. If, however, as petitioners Lavicka and Piegare suggest, the HUD Chicago area office could have obtained a tape of the 1980 census figures as early as July, 1981, which would have shown that the non-elderly portion of Academy Square would exceed 15% of the total number of units in the census tract, it does not necessarily follow that paragraph 5.8.2 of the consent decree bars HUD from financing the proposed development.

Assuming that the 1980 census data was not available to HUD in September, 1981, at the time the decision challenged herein was made,[6] the HUD area office did all that reasonably could be expected to attempt to comply with the relevant portions of the consent decree. Because the proposed site of Academy Square, census tract 2817, was located in a Revitalizing Area of the city, HUD knew that the 1970 census data for that tract was not necessarily completely reliable in 1981. Accordingly, HUD undertook on-site visits to census tract 2817 to insure that HUD's involvement with the development would conform to the dictates of the *Gautreaux* consent decree, particularly paragraph 5.8.2(iii).[7] Indeed, HUD's "eyeball" estimates were extremely accurate, varying just over three percentage points from the purported character of census tract 2817 according to the 1980 census figures. Moreover, HUD also determined, correctly, that there was no other assisted housing in the census tract and that the area had been steadily losing population and housing during the past decade and that an influx of housing was desperately needed in order to stabilize and revitalize the area. Under these circumstances, HUD's conduct would have to be deemed proper under the consent decree.

The same result would obtain even if petitioners are correct in their assertion that HUD could have availed itself of the 1980 census figures in September, 1981,

5. During the two hearings in open court prior to the date of this opinion (on August 20 and August 24, 1982), petitioners and HUD focused on the *asserted factual dispute of whether or not the 1980 census data was available to HUD* at the time it decided to reserve section 8 authority for Academy Square. Petitioners Lavicka and Piegare requested an evidentiary hearing to resolve this asserted dispute and both sides requested leave to supplement the record in this regard. Simply stated, however, the Court does not believe that the asserted factual dispute is material to the issue to be decided for, in our view, even if the dispute were resolved in favor of petitioners Lavicka and Piegare, they still would not prevail. Having reached this conclusion on the basis of the presentations of both sides at the August 20,

1982, hearing in open court and the memoranda submitted by petitioners, the Court issued the minute order, attached hereto as Appendix A, believing that, because of the indisputable and uncontested need for immediate action by the bonding authorities, a prompt order on the merits would be in the interest of all parties concerned. *See* part IV of this opinion, *infra*.

6. In the Court's view, the relevant time period under paragraph 5.8.2(iii) is the time that the determination is made to reserve section 8 contract authority, not the time actual construction begins.

7. Petitioners Lavicka and Piegare do not dispute the extent of HUD's efforts in this regard.

which figures show that the non-elderly component of the Academy Square project would constitute 18.25% of the total number of dwelling units in census tract 2817. In the Court's view, the consent decree must not be read to unduly restrict HUD's ability to assist the development of housing in the revitalizing areas of the city under the special circumstances confronting the Court at the present time. There is no dispute about the fact that the area in which census tract 2817 is located has been steadily losing housing stock and population since 1970;[8] that an influx of housing is solely needed to stabilize and revitalize the area; and that, at the present time, there are no federally assisted housing units in that census tract.

In our view, paragraph 5.8.2(iii) was not intended to prevent HUD from attempting to aid the development of housing in an area that might be well on its way to becoming an urban wasteland without such aid. Rather, paragraph 5.8.2(iii) of the consent decree was intended to prevent the dumping or clustering of assisted housing in areas of the city that are already dense with public housing. It would be ironic indeed if that provision were used to prevent the development of housing because the chosen site was too sparsely populated. As Judge Crowley noted in his opinion approving the consent decree, "the construction limits prevent an over-concentration of public housing," *Gautreaux v. Landrieu,* 523 F.Supp. 665, 671 (N.D.Ill.1981); they were not intended to prevent the construction of *any* public housing altogether. Thus, we conclude that paragraph 5.8.2(iii) is no bar to the development of Academy Square under the unique situation described above.

### III.

Several matters remain. Petitioners Lavicka and Piegare have requested that an evidentiary hearing be held on the question of the availability of the 1980 census data at the time the decision was made to reserve section 8 authority for Academy Square and both sides have requested leave to supplement the record with material supportive of their respective positions in that regard. This hearing cannot be held immediately, however, because of the contentions of both sides that time is needed to gather the evidence in question. In the Court's view, petitioners at this time have not met their burden of showing that there is evidence that the 1980 census data was available to the HUD Chicago area office at the relevant time. Nevertheless, we will allow both sides until 5:00 p.m. on August 30, 1982, to supplement the record in whatever manner they choose so that the issue will be preserved for an eventual appeal, should that occur.

■ Petitioners have also requested a stay of this order so that they may effect a possible appeal. In light of the strict deadlines governing the acquisition of financing and commencement of construction facing the developers of Academy Square, the Court will grant only a brief stay until 5:00 p.m. on August 31, 1982. The foregoing timetables will allow the parties to supplement the record on the contested factual issue and permit this Court to issue a prompt supplemental finding of fact thereon. The reviewing court thereby will have a complete record on all the issues should there ultimately be an appeal from this Court's ruling. In the meantime, if need be, the requisite paperwork may be commenced so that valuable time need not be lost in implementing this Court's order.

### IV.

Accordingly, petitioners' motions to intervene in this matter are granted. The relief requested by petitioners Heytow, *et al.* is granted and the relief requested by petitioners Lavicka and Piegare is denied. This order shall be stayed until 5:00 p.m. on August 31, 1982. It is so ordered.

### ON MOTION FOR RECONSIDERATION

This matter is before the Court on the motion of petitioners-intervenors William

---

**8.** According to the rough figures cited by petitioners and HUD on August 20, 1982, the available housing stock in that area has dropped almost 70% since 1970.

Lavicka and Barbara Piegare for reconsideration of this Court's prior opinion and order in this matter dated August 25, 1982, rejecting petitioners' attempt to block construction of the Academy Square housing development on the Near West Side of the City of Chicago because of alleged non-compliance with the consent decree entered herein on June 16, 1981, and for an extension of the stay of that opinion and order previously entered. The United States Department of Housing and Urban Development ("HUD") joins intervenors Eugene Heytow, Marcel Lutwak and Richard Parrillo, the developer/sponsors of Academy Square, in opposing petitioners' motion for reconsideration and extension of the stay. In the alternative, should this Court be inclined to disaffirm its earlier opinion and order, HUD has sought a waiver of the provision of the consent decree upon which petitioners base their challenge to the Academy Square project.

For the reasons and for the limited purpose set forth below, petitioners' motion for reconsideration will be granted. Having thoroughly reviewed the supplemental submissions of all parties concerned and heard the oral argument of counsel for all parties concerned, however, the Court will reaffirm its earlier opinion and order as supplemented by the additional findings and conclusions set forth in this opinion. The stay of our earlier opinion and order will be dissolved.

Petitioners contend, in a two-pronged challenge to the Academy Square project, that HUD erred in determining that Academy Square complied with paragraph 5.8.-2(iii) of the consent decree[1] in that HUD based its determination, in large part, on 1970 census data, rather than the 1980 data that petitioners contend was available at the time the relevant decision was made, and that HUD has not shown that the Academy Square project would be in the best interests of the community for the purpose of obtaining a waiver of the requirements of paragraph 5.8.2(iii) pursuant to paragraph 8.5 of the decree.[2] In our earlier opinion and order dated August 25, 1982, setting forth the rationale for our order dated August 20, 1982, we held that petitioners, at that time, had not met their burden of showing that the 1980 census data was available to the HUD Chicago Area Office in September, 1981, when the decision was made to approve the Academy Square project.[3] The Court further stated that, assuming that the 1980 data was not

1. Paragraph 5.8.2(iii) provides, in pertinent part:

   5.8.2. HUD will not reserve contract authority for Section 8 New Construction assisted housing units in the General Area or the Revitalizing Area of the Chicago SMSA in any structure, or in any group of structures on the same or contiguous parcels of real estate, which:

   \*   \*   \*   \*   \*   \*

   (iii) Is to be located in any census tract if, following such location, the aggregate number of apartments and single family residences theretofore made available under any assisted housing program in such census tract would constitute more than 15% of the total number of apartments and single family residences in such census tract.

2. Paragraph 8.5 provides, in pertinent part:

   8.5. In any fiscal year in which HUD wishes to approve contract authority for assisted housing that does not conform to the percentages specified in paragraph ... 5.8.2 hereof, it may approve such contract authority with the written consent of plaintiffs' counsel without obtaining an order from the

Court. If plaintiffs' counsel does not consent, HUD may seek a Court Order waiving the provision in question.... If HUD wishes to approve contract authority that does not conform to the provisions of subparagraph ... (iii) of paragraph 5.8.2, it must show ... with respect to subparagraph (iii), that approving the contract authority is in the best interests of the community where the assisted housing would be located.

3. As we stated in our earlier opinion at note 5 therein, the Court proceeded promptly to a ruling on the merits based upon the record before it at that time because of the expressed urgent need of the bonding authorities, who expected to provide financing for Academy Square, for a resolution of this dispute one way or another. In part III of the prior opinion, the Court requested that the parties supplement the record, as they have now done, so that this supplemental opinion might be issued on a more complete record that, regardless of the ultimate outcome, would be of more use to the parties and to the court of appeals in the event of an appeal.

available to HUD at the relevant time, HUD had acted reasonably in using 1970 census data supplemented by on-site visual inspections of the proposed site of the Academy Square project in reaching its determination that the number of assisted housing units to be contained in Academy Square would not exceed 15 percent of the total number of dwelling units in the census tract after the project was completed as required by paragraph 5.8.2(iii) of the decree, even though that determination was ultimately proven to be in error by approximately three percentage points when HUD received the 1980 census figures. Assuming for the sake of argument, however, that the 1980 data was available to the local HUD office in September, 1981, the Court stated that, in its view, paragraph 5.8.2(iii) of the consent decree did not bar construction of Academy Square under the particular facts and circumstances of the instant case.[4]

The supplementary submissions of petitioners and HUD do not really conflict with respect to the availability of the 1980 census figures to the HUD Chicago Area Office in September, 1981, at the time the decision to approve the Academy Square project was made. According to the deposition testimony of Mr. Forrest Williams, Acting Branch Chief of the Data User Service Division of the United States Bureau of the Census, submitted by petitioners, a tape containing 1980 census data on housing by census tract first became available to the public in July, 1981.[5] After that date, any interested person could have obtained a copy of the data tape from Mr. Williams' division for a fee, and specific census information contained on the tape could have also been obtained, presumably for a fee, from various consultants who originally purchased the entire tape from the Data User Service Division. The Bureau of the Census itself, however, apparently did not disseminate information regarding particular census tracts to the public. Such information had to be obtained from someone who had purchased the entire tape from the Data User Service Division.

It is thus not quite accurate for petitioners to argue, as they do, that the 1980 census tract was "only a phone call away" from the HUD Area Office. While the HUD Area Office could have determined by phone that the 1980 data tape was *available,* it could not have obtained the *specific information* it required with respect to census tract 2817, the proposed site of Academy Square, in that manner without paying for the entire tape or paying an outside consultant for the information. In an effort to avoid the duplication of time and effort, to say nothing of the expense, that would result if each HUD Area Office around the country would order census data directly from the Bureau of the Census as it became available, HUD and the Department of Commerce established a central office within HUD for the procurement and dissemination of census data throughout the department. According to Mr. David S. Cristy, Chief of the Data Management and Statistics Branch of the Management Services Division of HUD's Office of Information Policies and Systems, whose affidavit was submitted by HUD, the HUD central

---

**4.** At the time the Court issued its earlier opinion and order, HUD had *not* sought a waiver, under paragraph 8.5 of the decree, of the 15 percent ceiling contained in paragraph 5.8.2(iii) on the assumption that it had properly determined that Academy Square complied with paragraph 5.8.2(iii) using 1970 census data and on-site visual inspections. Thus, the Court's determination that paragraph 5.8.2(iii) did not bar development of Academy Square *even if* the 1980 census data were deemed controlling was based upon its interpretation of the intent of paragraph 5.8.2(iii) of the decree and not on any best interests analysis mandated by paragraph 8.5. As HUD has now sought a waiver

under that paragraph of the decree, the focus of our analysis must be on the best interests standard should it be determined that the 1980 census data was available to HUD and controlling in this particular case.

**5.** This was not the final, official version of the 1980 census data, however. The final data, containing some changes and more detail not relevant for our purposes, did not become available until January, 1982. It was this final data tape that was ultimately sent to HUD in Washington, D.C., and disseminated from there to the various HUD Area Offices around the country.

office did not receive the data tapes relevant to the HUD Chicago Area Office's decision in this matter until December, 1981. The information contained on the tapes was reduced to computer software programs which were not disseminated to HUD field offices until March, 1982.

The Court cannot say that HUD's establishment of a central office for the procurement and dissemination of census data is unreasonable, nor was it unreasonable, given this fact, that the HUD Area Office did not independently contact the Bureau of the Census directly to obtain the relevant census tape. This does not mean that the HUD Area Office could have reasonably relied solely on 1970 census data, which was more than ten years old at the time, in evaluating the Academy Square project, and it did not do so in this case. Rather, because the HUD Area Manager knew that the 1970 census data on housing for census tract 2817 was out of date in light of the substantial amount of demolition and redevelopment that had been occurring in the area, he and members of his staff visited the proposed site for Academy Square in order to determine the project's compliance with the density requirements of paragraph 5.8.2(iii) of the consent decree. While they did not physically count each and every dwelling unit or building in the census tract, they did note, according to their affidavits, that the proposed site of Academy Square was located in a "revitalizing" area both in general terms and as that term is used in the consent decree, that it was in close proximity to the main business district of the city and that it was located near major medical, educational and transportation facilities. In addition, a review of data maintained by the Area Office's Economic and Market Analysis Division indicated that there were no assisted housing projects as defined in the consent decree currently located in census tract 2817, with the possible exception of some section 8 existing units. Thus, on the basis of his review of the

census data available to him and his personal observations of the area, the HUD Area Manager found that the Academy Square project complied with the density limitations of paragraph 5.8.2(iii) and fulfilled the general spirit and purpose of providing relief to the Gautreaux plaintiff class under the consent decree.[6]

Accordingly, on the basis of the supplemental submissions of HUD and the petitioners, this Court finds that 1980 census data was not available to the HUD Chicago Area Office at the time it needed to decide whether to approve the Academy Square project and that, in light of that fact, the Area Office acted reasonably in attempting to ascertain whether the proposed project complied with the housing density requirements of the consent decree.

■ Under normal circumstances, such a determination would end the matter. However, in view of the severe time constraints involved in securing financing for and beginning construction of the Academy Square project and the virtual certainty of an appeal of whatever order this Court might enter, we feel constrained in fairness to both the petitioners and the Academy Square project developers to resolve any loose ends in order that a final resolution of this matter may be accomplished as soon as possible. Therefore, assuming that the 1980 census data should be deemed to have been available to the HUD Area Office at the time it needed to decide whether to approve the Academy Square development or that HUD could have done more to ascertain the precise impact of the proposed development vis-a-vis the density requirements of paragraph 5.8.2(iii) of the decree even given the unavailability of the 1980 data, we proceed to the alternative issue raised by petitioners and HUD with respect to the propriety of a waiver of the density requirements under paragraph 8.5 of the decree.[7]

Petitioners and HUD have submitted several volumes of material, admirably accu-

---

**6.** Indeed, the projections and estimates of the HUD Area Office turned out to be quite accurate, varying only about three percent from the actual housing density resulting from Academy

Square according to the 1980 census figures for tract 2817.

**7.** The Court notes that, procedurally, the waiv-

mulated under extreme time pressure, in support of their respective positions that the best interests of the Near West Side community that is the proposed site of Academy Square would or would not be served by construction of the project. Preliminarily, we note that it is extremely difficult, if not impossible, for the Court to determine where the best interests of a particular community may lie, particularly when the residents of the area themselves have divergent perspectives on the question.[8] Indeed, the difficulty of the issue is illustrated by the fact that plaintiffs' counsel, who has been associated with this case longer than anyone else involved in these proceedings and who undoubtedly has faced issues similar to this in the past, initially opposed HUD's position with respect to Academy Square but now has joined in HUD's request that this Court waive compliance with paragraph 5.8.2(iii), if necessary, so that the project may go forward.[9] Nevertheless, based on the supplemental

submissions of petitioners and HUD and the written and oral comments on those submissions by all concerned parties, the Court finds that the Academy Square project is in the best interests of the community in which it is to be located.

Although we have carefully considered the affidavits of the experts and neighborhood residents, the map of the area and other materials submitted by petitioners, we are persuaded by HUD's position and evidentiary materials that the Academy Square project would contribute to and enhance the revitalization of the Jackson Boulevard District and the Near West Side area by the infusion of both elderly and family housing into an area that has suffered extensive demolition of existing housing and loss of population in the past, but which is now on the road to recovery. It is undisputed that at the present time there are no assisted housing units in the census tract encompassing the proposed site of Academy Square, aside from the possibility alluded to by both sides that section 8 certificate hold-

---

er issue arises in this context after HUD approved the proposed project rather than on HUD's petition for leave to approve a particular project as envisioned by the consent decree. As we noted earlier, however, note 4, *supra,* HUD did not seek a waiver of the 15 percent limitation initially because it felt that its use of 1970 census data together with visual on-site inspections and reference to the data on assisted housing units in the tract satisfied its obligation under the decree. In any event, the standard to be applied to the waiver question—whether the proposed project is in the best interests of the community where the assisted housing is to be located—is equally applicable at this point in time as it would be if HUD had not yet approved the project. In the future, however, the Court assumes that HUD will attempt to avail itself of the waiver mechanism under paragraph 8.5 in appropriate cases *before* it approves a project that might require such a waiver.

**8.** We note, for example, that while petitioners Lavicka and Piegare, who both live in the Jackson Boulevard District, strongly oppose the construction of Academy Square, a significant number of residents of the area who strongly favor construction of the project also appeared at an earlier hearing on this matter before this Court on August 20, 1982. At that time, a spokesperson for the group, Ms. Nancy Jefferson, who is executive director of a community organization on the Near West Side, requested and was granted leave to address the Court

with regard to her group's position on the Academy Square development. In Ms. Jefferson's view, Academy Square would be a welcome addition to the community in that it would, among other things, contribute to what she hoped would be and continue to be a racially integrated area and would replace the dilapidated and deteriorating housing stock that has characterized the area in the past.

**9.** The fact that plaintiffs' counsel has now joined HUD in its request for a waiver in the rather unique procedural context in which we find ourselves does not alter the standard to be applied by the Court in this context. Although plaintiffs' counsel and HUD might have agreed to a waiver of the requirements of paragraph 5.8.2(iii) without the intervention of the Court before HUD actually approved the project, the Court must apply the best interests of the community standard when the waiver issue is presented as it is at this point in time. This action by the Court, of course, should not be regarded as a routine overseeing of the waiver provision of the consent decree. Obviously, where plaintiffs and HUD agree to a timely waiver in compliance with paragraph 5.8.2(iii), this Court, absent gross misconduct or abuse of discretion by the parties, would not exhaustively review the underlying basis for the waiver in the manner as we have so done in the instant matter.

ers may occupy a few of the existing units in that tract and that construction of the project would result in there being a total of approximately 18.25 percent assisted units out of the total number of dwelling units. We are unpersuaded by petitioners' argument that construction of Academy Square would halt the revitalization of the area or so alter its present composition as to render future or continued revitalization unlikely. On the contrary, the area is situated in such close proximity to major educational, medical, industrial and business institutions, as well as to means of private and public transportation as to render it a prime site for redevelopment and revitalization now and in the future, regardless of the construction of Academy Square.[10]

Accordingly, petitioners' motion for reconsideration is granted and the Court reaffirms its prior opinion and order in this matter supplemented by the additional findings and conclusions set forth above. The stay previously entered in this matter is dissolved. It is so ordered.

---

**10.** Counsel for petitioners and those who submitted affidavits in their behalf emphasize that they are not opposed to scattered-site assisted housing nor to the concept of assisted housing per se, but rather to the concentration of 100 units of assisted non-elderly housing on one site. Yet petitioners' arguments and concerns would apply equally to an 82-unit development that would concededly comply with the density limitations contained in the consent decree. Petitioners have failed to show how the addition of another 18 units would result in any presumed harm to what they view as the best interest of the community, which would not be equally present in an unquestionably appropriate 82-unit development.