707 F.2d 265
 Dorothy GAUTREAUX, et al., Plaintiffs-Appellees,
v.
Samuel R. PIERCE, Jr., Secretary, United States Department
of Housing and Urban Development, et al.,
Defendants-Appellees,
and
Eugene Heytow, Richard Parrillo and Marcel Lutwak,
Intervenors-Appellees.
Appeal of: William LAVICKA and Barbara Piegare,
Intervenors-Appellants.
 No. 82-2409.
 United States Court of Appeals,
Seventh Circuit.
 Argued March 14, 1983.
Decided April 29, 1983.
 
 Michael L. Shakman, Krupp & Miller, Chicago, Ill., for appellants.
 John Jensen, U.S. Dept. of Housing & Urban Development, F. Thomas Hecht, Levy & Erens, Chicago, Ill., for appellees.
 Before CUMMINGS, Chief Judge, BAUER and POSNER, Circuit Judges.
 PER CURIAM.
 
 
 1
 This case is still another aspect of the Gautreaux saga commencing in 1966 and primarily involving locations for public housing in the Chicago metropolitan area. The history of this complex litigation is described in Gautreaux v. Pierce, 690 F.2d 616, 619-621 (7th Cir.1982), where we approved a June 30, 1981, consent decree terminating the litigation that had lasted until then.[1] Paragraph 8.1 of the consent decree provides that jurisdiction is retained by the district court to enable the Gautreaux plaintiffs and the Department of Housing and Urban Development (HUD) to apply for further orders involving the construction, implementation, modification or enforcement of the consent decree. Gautreaux v. Landrieu, 523 F.Supp. 665, 680-681 (N.D.Ill.1981). The present controversy involves HUD's approval of housing assistance payments for development of the Academy Square housing project on the Near West Side of Chicago.
 
 
 2
 On September 30, 1981, HUD approved the Academy Square project being developed by intervenors Eugene Heytow, Richard Parrillo and Marcel Lutwak (developers). Academy Square is a proposed 200-unit project consisting of 100 units of assisted family housing and 100 units of elderly housing at Van Buren and Loomis Streets in Census Tract 2817 which is within a "Revitalizing Area." Such an area is defined in the consent decree as a Chicago area "having substantial minority occupancy and undergoing substantial physical development" located within certain census tracts including Census Tract 2817. 523 F.Supp. at 674, 683. According to Paragraph 5.8.2(iii) of the consent decree, HUD will not reserve contract authority for new construction assisted housing units in a Revitalizing Area of Chicago if the number of apartments and single family residences made available under an assisted housing program in the particular census tract "would constitute more than 15% of the total number of apartments and single family residences in such census tract." Id. at 680. In deciding to reserve funds for the Academy Square project, HUD relied to some extent on 1970 census data because its Chicago area office did not have 1980 census data at the time. Although construction of Academy Square is within the density ceiling under the 1970 census data, under the 1980 data non-elderly assisted housing would constitute 18.25% of the dwelling units. Gautreaux v. Pierce, 548 F.Supp. 1284, 1286 n. 2, 1289 (N.D.Ill.1982).
 
 
 3
 On August 20, 1982, the developers petitioned the district court for an order declaring that no previous court orders precluded HUD from providing Section 8 housing assistance payments for the development of Academy Square. The Section 8 housing assistance payments program for new construction refers to non-elderly housing subsidized by HUD under Section 8 of the United States Housing Act of 1937 (42 U.S.C. Sec. 1437). Assisted housing is defined in the consent decree as non-elderly housing subsidized by HUD. 523 F.Supp. at 673. The requested relief was to satisfy bond counsel and was in the nature of emergency relief "because of the indisputable and uncontested need for immediate action by the bonding authorities." 548 F.Supp. at 1288 n. 5.
 
 
 4
 On the same day, William Lavicka and Barbara Piegare (residents), who live near the Academy Square project, petitioned the district court to issue a rule to show cause why the Secretary of HUD and its Chicago area manager should not be held in contempt of court for reserving Section 8 assisted housing funds for the Academy Square project. The developers and residents were permitted to intervene[2] for the limited purposes of requesting the district court to determine whether previous orders precluded HUD and others from providing housing assistance payments to the Academy Square development and financing for its construction and whether HUD's actions with regard to that project were permitted by the consent decree. 548 F.Supp. at 1286. On August 23, Judge Aspen entered an order granting the developers the relief they requested. Residents' App. 23-25. On August 25 the district judge handed down a memorandum opinion and order reiterating permission for the developers and residents to intervene, and holding that nothing in the consent decree or prior orders of the district court precluded HUD, the Chicago Housing Authority or the Chicago Metropolitan Housing Development Corporation from providing financing for the construction of Academy Square. 548 F.Supp. 1284-1289. Despite this firm holding, the district court also granted the residents leave to supplement the record on the question of the availability to HUD of the 1980 census data, essentially "so that the issue will be preserved for an eventual appeal, should that occur." Id. at 1289.
 
 
 5
 On September 2, 1982, Judge Aspen handed down a second memorandum opinion and order reported in 548 F.Supp. 1289-1294. The court granted the residents' motion for reconsideration of the August 25 opinion and order, but after reviewing the supplemental factual submissions and hearing oral argument, the district judge reaffirmed his earlier opinion and again held that the Academy Square project complied with the consent decree even though HUD had based its September 30, 1981, approval in large part on 1970 census data rather than on 1980 census data. In this second opinion, the district court found that 1980 census data was not available to HUD's Chicago area office at the time it approved the Academy Square project and that HUD had acted reasonably in using the 1970 data supplemented by on-site visits to ascertain whether the project complied with the density requirements of the consent decree.
 
 
 6
 In addition, because of the "severe time constraints involved in securing financing for and beginning construction of the Academy Square project and the virtual certainty of an appeal," id. at 1292, the district judge held in the alternative that even if the project approval was in violation of the consent decree, a waiver of the density requirements was appropriate in this case. HUD had not sought a waiver in September 1981 when it originally approved the project because at that time its Chicago area director thought the project complied with the consent decree's density requirement (Residents' App. 76-77). However, at the suggestion of the district court, HUD filed a motion on August 30 requesting waiver of the 15% density ceiling of Paragraph 5.8.2(iii) pursuant to Paragraph 8.5 of the consent decree, both quoted in the Appendix hereto. Included in the materials supporting HUD's motion was a letter from the Gautreaux plaintiffs' counsel joining in that request. Judge Aspen stated that if the Gautreaux plaintiffs' counsel and HUD had agreed to such a waiver before HUD approved the project, no court intervention would have been necessary under Paragraph 8.5. Since the waiver question arose after HUD's approval, the court held it should determine whether approving the contract authority "is in the best interests of the community where the assisted housing would be located," a determination required to be made under Paragraph 8.5 of the consent decree in the absence of consent by plaintiffs' counsel. After reviewing the evidence, the court concluded that the Academy Square project is in the best interests of the community, and that waiver was appropriate. We affirm on the basis of waiver.
 
 
 7
 The consent decree contains two provisions which control the outcome of this case. As noted above, Paragraph 5.8.2(iii) provides a 15% density ceiling on assisted housing units in a Revitalizing Area. Paragraph 8.5 of the consent decree, however, permits HUD to waive the 15% density ceiling "with the written consent of plaintiffs' counsel without obtaining an order from the Court." Lacking such consent, Paragraph 8.5 empowers HUD to seek a court order waiving the density requirement upon showing "that approving the contract authority is in the best interests of the community where the assisted housing would be located." 523 F.Supp. at 681. Because the Gautreaux plaintiffs' consent came after HUD had approved the contract authority, the district court held that a "best interests" determination was necessary under Paragraph 8.5. We express no opinion on this interpretation of Paragraph 8.5, but merely review the district court's "best interests" determination.
 
 
 8
 Although both intervenors appear to agree that the district court's "best interests" finding is a finding of fact, they disagree on our standard of review. The residents argue that the clearly erroneous standard of Federal Rule of Civil Procedure 52(a) does not apply in cases that are presented entirely on a paper record. See, e.g., John R. Thompson Co. v. United States, 477 F.2d 164, 167 (7th Cir.1973). Without expressing any views on the validity of this proposition, we note that this case did not consist solely of documentary materials. At the August 20 hearing, the district court heard testimony from Ms. Nancy Jefferson, executive director of the Midwest Community Council, a community organization on the Near West Side.[3] The district court made explicit reference to her testimony, 548 F.Supp. at 1293 and n. 8, and also noted that its conclusions were based on the written submissions, and "the written and oral comments on those submissions by all concerned parties." Id. at 1293. We therefore review the district court's findings in accordance with the "clearly erroneous" test.
 
 
 9
 In holding that the Academy Square project was in "the best interests of the community where the assisted housing would be located," the district court relied on several factors. First, the court was impressed with the fact that the Gautreaux plaintiffs' counsel had joined in HUD's waiver request. Although the letter from plaintiffs' counsel to HUD indicates his belief that, because of the timing of the waiver request, approval of the project by the court would be appropriate, it also clearly indicates his belief that "a waiver is appropriate":
 
 
 10
 For the reasons that you stated in our consultations, we believe that, on balance, given the specific facts and particular circumstances of the Academy Square project, a waiver is appropriate. Therefore, we consent to your request for a waiver.
 
 
 11
 Since you have requested our consent to a waiver subsequent, rather than prior, to your approval of contract authority for the Academy Square project, we believe it is appropriate that the District Court authorize approval of the project.
 
 
 12
 Because plaintiffs' consent would have been dispositive if it had occurred prior to authorization of the project, and because the consent decree was intended to protect the plaintiff class, plaintiffs' consent must be given considerable weight.
 
 
 13
 Second, the court relied on uncontested evidence showing that the census tract had suffered extensive demolition of existing housing and loss of population since 1970, and agreed with HUD that the Academy Square project would enhance the neighborhood by the infusion of both elderly and family housing. 548 F.Supp. at 1293. The court also found that the construction of Academy Square would not deter other redevelopment and revitalization of the neighborhood because the area is favorably situated in close proximity to major educational, medical, industrial and business institutions and the availability of private and public transportation. Third, the court relied on undisputed evidence showing that at present there are no assisted housing units in the census tract. Finally, the court noted that according to the 1980 census figures, the 15% density ceiling would be exceeded by only 18 units, and that the residents had not shown how the addition of those 18 units would result in harm to the best interests of the community which would not be present in an unquestionably appropriate development with 18 units less. 548 F.Supp. at 1294 n. 10.
 
 
 14
 The residents, in opposition, introduced affidavits showing, among other things, that the area surrounding the census tract has a heavy concentration of public housing; that because of zoning in the census tract, the site for Academy Square is virtually the only site available for residential development, though two other small areas also exist; and that the construction of a large, concentrated low-income project will overwhelm attempts to establish a stable, integrated middle-class community in the census tract.
 
 
 15
 We note our agreement with the district court's view that "it is extremely difficult, if not impossible * * * to determine where the best interests of a particular community may lie, particularly where the residents of the area themselves have divergent perspectives on the question." 548 F.Supp. at 1293. In this case there is testimony indicating that from the point of view of the Midwest Community Council, see supra note 3, Academy Square would be a welcome addition to the community, while residents Lavicka and Piegare on the other hand are opposed to the project. Nonetheless, our review of the materials before the district court in considering the waiver satisfies us that the decision that Academy Square is in the best interests of the community was not clearly erroneous. We therefore affirm the district court's order of September 2, 1982, insofar as it granted a waiver of the consent decree's density requirements for the Academy Square development and thus approved HUD's contract authority.[4] Costs to HUD and developers.
 
 APPENDIX
 
 16
 Paragraph 5.8.2 of the consent decree provides in pertinent part, 523 F.Supp. at 680:
 
 
 17
 HUD will not reserve contract authority for Section 8 New Construction assisted housing units in the General Area or the Revitalizing Area of the Chicago SMSA in any structure, or in any group of structures on the same or contiguous parcels of real estate, which:
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 (iii) Is to be located in any census tract if,
 
 
 21
 following such location, the aggregate number of apartments and single family residences theretofore made available under any assisted housing program in such census tract would constitute more than 15% of the total number of apartments and single family residences in such census tract.
 
 
 22
 Paragraph 8.5 of the consent decree provides, 523 F.Supp. at 681:
 
 
 23
 In any fiscal year in which HUD wishes to approve contract authority for assisted housing that does not conform to the percentages specified in paragraph 5.5.2, 5.5.3, 5.5.4 or 5.6.2 hereof, or to the provisions of paragraph 5.7 or 5.8.2 hereof, it may approve such contract authority with the written consent of plaintiffs' counsel without obtaining an order from the Court. If plaintiffs' counsel does not consent, HUD may seek a Court Order waiving the provision in question. CHA may seek plaintiffs' counsel's consent or, where necessary, a Court order waiving any of the provisions referred to in this paragraph with respect to contract authority for public housing projects. If HUD wishes to approve contract authority that does not conform to the provisions of subparagraph (i), (ii) or (iii) of paragraph 5.8.2, it must show, with respect to subparagraph (i) or (ii), that there is no practical alternative to approving such contract authority, or, with respect to subparagraph (iii), that approving the contract authority is in the best interests of the community where the assisted housing would be located.
 
 
 24
 POSNER, Circuit Judge, concurring.
 
 
 25
 I am not persuaded by the grounds on which the district court rejected the appellants' objections to the Academy Square project, including the ground on which this court affirms. I would affirm but on another ground.
 
 
 26
 The consent decree forbids HUD to finance a public housing project if as a result of building it more than 15 percent of all the housing units in its census tract would be public housing units. The Academy Square project would cause this ceiling to be exceeded by 20 percent (18 percent being 120 percent of 15 percent), and although the decree can be read to allow HUD to authorize a project on the basis of a reasonable estimate that later turns out to be wrong, it is hard to understand why in a $30 million project HUD could not have found $110 to buy the computer tape that showed the number of housing units in 1980. HUD should not have relied on the 1970 census plus a casual "on-site inspection" when it knew that the population of the tract had fallen substantially since 1970.
 
 
 27
 Although the 15 percent ceiling can be waived in writing by the lawyer for the original plaintiffs, I interpret the statement in his letter to HUD that "since you have requested our consent to a waiver subsequent rather than prior to your approval of contract authority for the Academy Square Project, we believe it is appropriate for the District Court to authorize approval of the project," to mean that HUD and the developers had to take their chances on getting court approval because it was too late for a written waiver. The 15 percent ceiling can also be waived if HUD shows to the court's satisfaction that the project "is in the best interests of the community where the assisted housing would be located." The district court found that it is, and this court upholds its finding. But I have my doubts whether such a provision in a consent decree is even justiciable by a federal judge, whose authority is limited by Article III of the Constitution to the exercise of judicial power.
 
 
 28
 For a decision to be judicial in character, the standard for decision must be definite enough to allow a reasoned judgment, as distinct from a political judgment such as a legislative or administrative body might make. In Federal Radio Comm'n v. General Elec. Co., 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969 (1930), therefore, the Supreme Court said that it could not "exercise or participate in the exercise of functions which are essentially legislative or administrative," id. at 469, 50 S.Ct. at 390, and so would not review an administrative decision refusing to renew a radio station's license under a statute providing that the reviewing court "may alter or revise the decision appealed from and enter such judgment as to it may seem just." Id. at 467, 50 S.Ct. at 390.
 
 
 29
 A "best interests of the community" standard is not a proper judicial standard. I say this realizing that domestic relations courts frequently use the "best interests of the child" as their lodestar for resolving custody questions. Article III courts have no domestic relations jurisdiction, and will not even decide domestic relations questions that arise in diversity cases, see, e.g., Lloyd v. Loeffler, 694 F.2d 489, 491-95 (7th Cir.1982). These courts do enforce many vague statutory criteria, many vague common law standards, and many vague terms in consent decrees. In fact, the term "best interests" appears 27 times in the United States Code. But context can give the term meaning, as in the Speedy Trial Act, 18 U.S.C. Sec. 3161(h)(8)(A), where the standard is "the best interests of the public and the defendant in a speedy trial." True, federal law allows an Indian to petition for the return of a child that has been adopted away from him when the adoption is annulled and the return of the child to its natural parent would be "in the best interests of the child," 25 U.S.C. Sec. 1916(a); but this provision is enforceable only in tribal and state courts, see 25 U.S.C. Sec. 1912 (incorporated by reference in section 1916(a)). Moreover, the "best interests of the community" is vaguer than the "best interests of the child"--which is to say, of a particular individual--since a community is an aggregation of individuals having different, and in this case warring, interests. What is in a community's best interests is a question to address to a philosopher, a city planner, a politician, an arbitrator. Put to a judge it is completely open-ended--you might as well just tell him to do the "right" or (as in Federal Radio Comm'n v. General Elec. Co., supra ) the "just" thing.
 
 
 30
 But we need not decide whether the "best interests of the community" standard is so formless that Congress would be violating Article III if it told us to enforce it, for Congress has not enacted the standard applied in this case. The district judge was asked to enforce not a statute but a consent decree--a contract approved by a court. A judge should not approve a provision in a consent decree that would require him to make nonjudicial judgments. If the parties to the decree wanted someone to make a "best interests of the community" determination, as evidently they did, they should have appointed an arbitrator.
 
 
 31
 A court will not enforce an ordinary contract that is indefinite--a contract that does not specify a price, for example (unless it appears that the parties meant the price to be the market price or some other readily ascertainable standard of value). Farnsworth, Contracts 194-95 (1982); Simpson, Handbook of the Law of Contracts 69-71 (2d ed. 1965). Similarly, federal courts will not set freight rates. See 13 Wright, Miller & Cooper, Federal Practice and Procedure Sec. 3535 at p. 323 (1975). When courts do in effect fix a price--when they fix the reasonable "price" of life and limb in awarding damages in personal-injury cases, for example--they do so in accordance with objective standards, which are lacking here. If courts will not let contracting parties delegate to them the function of setting essential terms of the contract, no more should they agree to play city planner just because the parties would like them to. I am sure the learned district judge in this case would have more than raised an eyebrow if the consent decree had required him to waive its limitations in any circumstances where an enlightened city planner would do so--but I am just paraphrasing the "best interests of the community" standard. If anything, the paraphrase makes the decree more specific by directing the judge to a body of professional knowledge. The "best interests" provision in the decree does not have reference just to the sort of technical factors that a city planner might take into account; notions of racial balance are implicit given the background of the decree, though there is no indication of the weight to be given them.
 
 
 32
 Although the parties to this decree sought to delegate a nonjudicial, an administrative or political, function to the district judge, and he should not--at least as an original matter--have accepted the delegation, I am mindful that this court approved the decree on a previous appeal. Gautreaux v. Pierce, 690 F.2d 616 (7th Cir.1982). It is true that the "best interests" provision was not discussed, that the objection I am raising to enforcement of the provision goes to subject-matter jurisdiction, and that these appellants were not parties to the earlier proceeding; but none of these points is an absolute bar to applying the law of the case doctrine to prevent litigating the validity of the provision on this appeal. See 18 Wright, Miller & Cooper, Federal Practice and Procedure Sec. 4478 at pp. 789, 799-800 (1981). And though the law of the case doctrine is flexible, and we do not have to apply it here, my inclination would be to apply it; once a consent decree is judicially approved, the parties ought to be able to rely on its being valid in its entirety. I shall therefore assume that for purposes of this appeal the "best interests" provision is valid after all.
 
 
 33
 Since the provision is an exception to the 15 percent limitation, a limitation that we must assume has some substantial purpose behind it, the burden of proving the applicability of the exception was on the party arguing for it, on HUD in other words. I cannot find in the record substantial evidence on which to base a conclusion that HUD carried its burden. The various shards of evidence on which my brethren rely seem to me unpersuasive singly and in combination. Although the letter from the plaintiffs' counsel to HUD expresses support for the project, at most this shows that the project is in the original plaintiffs' best interests, and they are not the entire relevant community. The proposition that the project "would enhance the neighborhood by the infusion of both elderly and family housing" is a conclusion that was stated without elaboration by the district court and is repeated without elaboration by this court. Just about its only evidentiary basis is a single, conclusional affidavit by a HUD official. The appellants submitted a number of counteraffidavits whose common-sense thrust was that a large public housing project is bad news for a small residential neighborhood. The fact that the neighborhood has been losing population for years provides no basis for thinking that a public housing project would be an effective method of revitalization. Obviously the neighborhood is extremely fragile; the Academy Square project may be the coup de grace. The court's statement (again taken without amplification from an unelaborated statement in the district court's opinion) that the project "would not deter other redevelopment and revitalization of the neighborhood because the area is favorably situated" is similarly unpersuasive: it ignores the erosion of population despite the area's favorable situation. That there is no public housing in the census tract today may be a good reason for putting some public housing in this tract rather than in some already saturated tract but it is not a good reason for putting in public housing above the 15 percent ceiling unless it would be impracticable to scale down the project, and there is no proof it would be. Finally, the absolute number of excess units (18) is irrelevant; it is the relative number that counts; if the tract had only 20 units this court would not be arguing that 18 units would be a trivial addition. Eighteen is significant in relation to the total number of units in this rather depopulated tract. It is, of course, 3 percent of those units--20 percent over the ceiling.
 
 
 34
 But despite all I have said I think the district court's order should be affirmed; and though my ground is one not argued by the parties or considered by the district court we can properly rely on such a ground when affirming rather than reversing a judgment. A consent decree is (as I have already noted) a type of contract; see, e.g., United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); White v. Roughton, 689 F.2d 118 (7th Cir.1982); these appellants are neither parties to the decree nor third-party beneficiaries; therefore they have no standing to complain that its terms are being violated.
 
 
 35
 The appellants' concern is that putting public housing into their neighborhood on the scale contemplated will blight the neighborhood. Such a claim would ordinarily sound in nuisance. But the appellants do not suggest that any state or federal statute or common law principle makes public housing a nuisance either in general or in the specific setting of this case. Their only claim is that the consent decree is being violated. But they are not parties to the decree. The parties are the original plaintiffs--who are black people eligible for public housing--HUD, and the Chicago Housing Authority, none of whom is complaining that the Academy Square project violates the decree. A nonparty has no more rights under a consent decree than he would have under any other contract to which he was not a party.
 
 
 36
 This principle has been applied frequently in antitrust cases. See, e.g., Data Processing Financial & Gen'l Corp. v. IBM Corp., 430 F.2d 1277, 1278 (8th Cir.1970) (per curiam); Cinema Service Corp. v. Twentieth Century-Fox Film Corp., 477 F.Supp. 174, 177-78 (W.D.Pa.1979). To reject it would be to turn every consent decree into a statute. Control Data Corp. v. IBM Corp., 306 F.Supp. 839, 846 (D.Minn.1969), aff'd sub nom. Data Processing Financial & Gen'l Corp. v. IBM Corp., supra. If a seller of bakery products sued a competitor for predatory pricing, and they entered into a consent settlement that the court approved and embodied in a consent decree forbidding the defendant to sell its bakery products below cost, no other sellers of bakery products besides the plaintiff could later intervene to enforce the consent decree because they thought the defendant was hurting them by selling below cost. The consent decree would not be a privately enforceable statute limiting the defendant's pricing freedom; it would be a source of enforceable rights only to the plaintiff. Similarly, the lawsuit that the consent decree in this case settled was brought by black people complaining of segregated public housing, and the decree was for their benefit. No one else has a legally enforceable right to block the project in the name of the decree.
 
 
 37
 It might make a difference if the appellants were third-party beneficiaries of the decree, though there is authority that it would not, see Manor Drug Stores v. Blue Chip Stamps, 339 F.Supp. 35, 38 (C.D.Cal.1971), rev'd on other grounds, 492 F.2d 136 (9th Cir.1973), rev'd on other grounds, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). But whether they are third-party beneficiaries depends on the intent of the original contracting parties; and it is unlikely that a decree intended to protect black people against segregated public housing was also intended to allow white residents of areas targeted for public housing to tie up proposed projects in litigation, by giving them the rights of parties. Any doubt on this score is dispelled by the provision allowing the limitations of the decree to be waived in writing by the plaintiffs' counsel. Whether or not he actually waived the 15 percent ceiling, the fact that he could have done so without getting the permission of--without consulting or even notifying--these appellants, or the court, is additional evidence that the decree was not intended to confer rights on anyone except the parties to it.
 
 
 
 [1]
 The district court's decision approving the consent decree is reported in 523 F.Supp. 665. The consent decree and two exhibits thereto appear at 523 F.Supp. at 672-683. The district court's decisions in this appeal are reported in 548 F.Supp. 1284, 1289
 
 
 [2]
 The propriety of both groups' intervention and their standing have not been challenged on appeal and therefore will not be discussed in this opinion
 
 
 [3]
 Midwest Community Council is a west side organization operating in an area encompassing the proposed site for the Academy Square development. Its brief amicus curiae favors affirmance of the district court's orders of August 25 and September 2, 1982
 
 
 [4]
 Because our affirmance is based on waiver, we are not passing on the district court's rulings relating to the 1970 census data