743 F.2d 526
 75 A.L.R.Fed. 555
 Dorothy GAUTREAUX, et al., Plaintiffs-Appellees,
v.
Samuel R. PIERCE, Secretary of Department of Housing and
Urban Development, et al., Defendants-Appellees,
and
Eugene Heytow, Richard Parrillo and Marcel Lutwak,
Intervenors-Appellees.
Appeal of William LAVICKA and Barbara Piegare.
 No. 84-1519.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 23, 1984.
Decided Sept. 7, 1984.
 
 Michael L. Shakman, Miller, Shakman, Nathan & Hamilton, Chicago, Ill., for intervenors-appellants.
 Alexander Polikoff, Business & Professional People For The Public Interest, Chicago, Ill., for plaintiffs-appellees.
 F. Thomas Hecht, Levy & Erens, Chicago, Ill., for intervenors-appellees.
 Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and WYATT, Senior District Judge.*
 CUMMINGS, Chief Judge.
 
 
 1
 This case considers another aspect in the long-standing litigation instituted in 1966 by Chicago public-housing tenants and applicants seeking relief from discriminatory housing and site selection policies and practices. At issue here is only the question of whether the district court properly denied appellants' January 23, 1984, motion for injunctive relief with regard to a marketing plan proposed by developers Heytow, Parrillo, and Lutwak for obtaining tenants for the Academy Square housing project. For details about other aspects of the litigation, see Gautreaux v. Pierce, 707 F.2d 265 (7th Cir.1983); Gautreaux v. Pierce, 690 F.2d 616 (7th Cir.1982) and cases cited therein at 620 n. 1.
 
 
 2
 Appellants here are residents of Census Tract 2817, the census tract in which the Academy Square project is located. This census tract is at the northwest end of the "Academy Square Community" on Chicago's Near West Side and has been identified in the consent decree between the United States Department of Housing and Urban Development and the Gautreaux plaintiff-class as a "Revitalizing Area."[1] See Gautreaux v. Landrieu, 523 F.Supp. 665, 674 and 683 (N.D.Ill.1981). Appellants originally sought to intervene to complain that HUD violated the decree by reserving funds for the project even though it exceeded the density limits in p 5.8.2(iii)[2] of the consent decree. See Gautreaux v. Pierce, 548 F.Supp. 1284 (N.D.Ill.1982), affirmed, 707 F.2d 265 (7th Cir.1983). The district court allowed intervention "for the limited purpose of requesting that the Court determine whether or not HUD's involvement with the Academy Square development is or is not precluded by the terms of the consent decree." 548 F.Supp. at 1287. In ruling on the merits, the district court determined first that HUD's actions were not barred by the consent decree, Id. at 1289, and, on motion for reconsideration, also granted a waiver of density requirements sought jointly by HUD and the plaintiff class pursuant to Consent Decree p 8.5.[3] The court relied on four factors in concluding that the waiver should be granted because it was in the best interests of the community: (1) the project would contribute to the revitalization of an area which had suffered extensive housing and population loss "but which is now on the road to recovery" (548 F.Supp. at 1293); (2) no other assisted housing then existed in the census tract (ibid.); (3) the area's location and good transportation services made it "a prime site for redevelopment and revitalization, regardless of the construction of Academy Square" (Id. at 1294); and (4) the Intervenors had not shown that the 18 units which were in excess of the consent decree density requirements would cause harm to the community's best interest in any way "which would not be equally present in an unquestionably appropriate 82-unit development" (Id. at n. 10). This Court affirmed the district court's decision to grant the waiver and did not expressly decide whether the district court's original ruling had been proper.[4] Gautreaux v. Pierce, 707 F.2d 265 (7th Cir.1983).
 
 
 3
 Subsequently, HUD personnel, representatives of the project developers, and counsel for the Gautreaux plaintiffs' class formed a working group to develop a marketing plan for obtaining applications for Academy Square tenancy. This group presented its preliminary report to the district court in December 1983. The Intervenors and other interested persons and organizations were given the opportunity to review the report and to file comments with the working group or with the district court (December 16, 1983, Tr. 5, 9).[5] On January 23, 1984, the Intervenors filed a Motion for Injunctive and Other Relief in which they requested a two-pronged injunction. They asked the district court to (1) enjoin the adoption and implementation of the affirmative marketing plan described in the preliminary report and (2) order the developers to develop a plan with "specific tenant population goals, by race" as well as mechanisms for enforcing those racial goals. January 23, 1983, Motion for relief at 2. Submitted with the motion were a memorandum of law and affidavits by purported experts in urban housing contending that the preliminary marketing plan was "unlikely" to result in an integrated project (Orfield Affid. p 6; McDermott Affid. p 3). The affiants stated that to achieve an integrated project it would be essential to establish both express goals for the racial composition of the project and a commitment to keep rental units off the market until they could be rented to tenants whose race allowed meeting those goals (Orfield Affid. p 9; McDermott Affid. p 5). The intervenors also submitted an affidavit from an official with the Michigan State Housing Development Authority who stated that his agency employs the above-suggested techniques (Bryson Affid.).
 
 
 4
 HUD submitted a memorandum and supporting affidavits of two of its officials who stated that the proposed plan was by far the most comprehensive and innovative ever submitted to HUD's Chicago office (Knox Affid. p 9; Heaney Affid. p 5). HUD also submitted an affidavit stating that the practices of the Michigan State Housing Development Authority which were identified in the Bryson affidavit violated HUD regulations and would not have been approved if they had been submitted to HUD (Clagett Affid. p 5).
 
 
 5
 The project developers[6] submitted affidavits of the director of the Leadership Council for Metropolitan Open Communities and of Academy Square's marketing agent. Both expressed cautious optimism about the likelihood of the project's integration under the proposed plan (Williams Affid. p 7; Hill Affid. p 4), while recognizing the possibility that a predominantly black tenant composition could result if an unusually large number of blacks applied for Academy Square housing (Williams Affid. p 7).[7]
 
 
 6
 The district court denied the Intervenors' motion on the basis that they lacked standing to continue to participate in the lawsuit, since their challenge to the proposed marketing plan exceeded the scope of the original intervention. 101 F.R.D. 704 (N.D.Ill.1984). Furthermore, even assuming that continued intervention was proper in general, the court declined to grant the Intervenors' requested relief, on the basis that it would require judicial supervision of the day-to-day administration of the consent decree, a task not expressly delegated to the court by the decree. Id. at 705. The court also noted that its experience with the parties led it to conclude that they were operating in good faith and, therefore, "a truly integrated Academy Square project is in fact possible." Id. at 706. Finally, the court suggested, without deciding the issue, that it was possible that racial quotas could properly be employed at Academy Square.
 
 
 7
 On appeal, the Intervenors outline three theories in support of their claim that both their continued intervention and the relief they seek are proper. We reject all three claims.
 
 
 8
 First, they claim that their motion was within the scope of the original limited intervention. The district court was correct in denying the Intervenors' motion on the basis that it was beyond the scope of the original limited intervention.[8] Because the court originally allowed intervention only to resolve the question of whether or not HUD's approval of the project which exceeded consent decree density requirements was proper under the decree, the court could strictly enforce those limitations at this subsequent stage of the action. Van Hoomissen v. Xerox Corporation, 497 F.2d 180 (9th Cir.1974). Since the Intervenors' January 23, 1984, motion seeks to affect the manner in which Academy Square units are marketed, and since marketing arrangements are not part of the density provisions or of any other provisions of the consent decree, their January 23, 1984, motion does not seek to enforce the consent decree and therefore simply is not within the scope of the original intervention.
 
 
 9
 Intervenors repeatedly attempt to characterize their claim here as flowing directly from the waiver litigation. However, their argument, which urges that the Academy Square census tract will "tip" from a stable integrated community to one which is racially unstable, is based on a faulty and actually unsupported premise. Briefly, the intervenors urge that implementation of the proposed marketing plan would thwart the purpose of the consent decree's density provisions, which they contend were intended not only to prevent over-concentration of assisted ("Section 8") housing (as enacted in Section 8 of the Housing and Community Development Act of 1974, 1 U.S.Code Cong. and Admin.News 748-752) but also "to attract to neighborhoods with such housing 'a white population * * * that can foster ultimate racial integration.' " Appellants' Br. 29. In support of this premise, they cite the original judicial approval of the Consent Decree, Gautreaux v. Landrieu, 523 F.Supp. at 671.
 
 
 10
 Intervenors' reliance on that authority is misplaced. The above-quoted phrase on which they rely does not refer to the density provisions at all but instead appears in a discussion of the validity of the consent decree's Revitalizing Areas concept. The discussion shows that the parties thought racial integration was likely to continue in these areas, even if Section 8 housing were built, because the areas' physical amenities (e.g., ongoing physical redevelopment as well as good transportation, shopping and location) made it probable that the white population which had already adjusted to the integration of minorities would remain and other whites would be attracted to the area. It is unquestionable that the district court and the parties viewed the physical redevelopment of the Revitalizing Areas, rather than the public housing density limitations, as the factor which was likely to foster integration. The full statement from which Intervenors quote indicates that "the proponents of the decree emphasize, the Revitalizing Areas are neighborhoods with a substantial minority population where there is visibly physical redevelopment, the kind of development which attracts a white population and can foster ultimate racial integration."[9] 523 F.Supp. at 671. Thus Intervenors' claim that their motion seeks to enforce the purpose of the consent decree is unfounded.
 
 
 11
 The court and the parties viewed the density limitation provisions as important to the validity of Revitalizing Areas because it prevented the over-concentration of public housing to which Intervenors accurately referred and not because it necessarily would serve the separate and distinct goal of encouraging racial integration. Intervenors were allowed by the district court to assert their claim that Academy Square violated the density provisions, see 548 F.Supp. 1294, but they were unsuccessful in convincing that court, or this one, that a waiver of the density provisions was not in the best interest of the Academy Square community. Id., affirmed, 707 F.2d 265. Intervenors now suggest that the waiver was granted in reliance on a promise which HUD cannot keep if the proposed marketing plan is implemented. They claim that in the waiver proceedings, HUD's Chicago Area Manager Elmer Binford promised "that Academy Square would be 'in the best interest of the community' because of its 'strong potential for providing non-segregated housing opportunities for members of the Gautreaux class.' " Appellants' Br. 30, quoting Binford Affid. p 9 (emphasis added in Brief). Thus they apparently argue that the proposed marketing plan must be enjoined and Intervenors' suggested racial quota plan must be substituted so that HUD can keep the promise it made to obtain the waiver.[10]
 
 
 12
 Again, Intervenors' underlying premises are incorrect. First, when Mr. Binford's quoted comment is reviewed in context, it becomes apparent that he was referring to the Academy Square neighborhood rather than, as Intervenors suggest, the project itself when he spoke of integrated living opportunities.[11] In their reply brief, Intervenors reassert their claim that HUD promised an integrated project and label any other view of Binford's statement as "patent nonsense." Reply Br. 4. But this summary rejection does not respond to or refute the indisputable thrust of Binford's actual words.
 
 
 13
 There is also another reason for rejecting Intervenors' assertion that Binford's "promise" provides a basis for their present motion. Intervenors have not shown that the waiver was granted because of Binford's "promise." Indeed, while the district judge expressed that he found "HUD's position and evidentiary materials" persuasive, 548 F.Supp. at 1293, his enumeration of the particular information on which he relied shows that he found most helpful the information HUD submitted about the Academy Square neighborhood in general rather than about the project itself:
 
 
 14
 Although we have carefully considered the affidavits of the experts and neighborhood residents, the map of the area and other materials submitted by petitioners, we are persuaded by HUD's position and evidentiary materials that the Academy Square project would contribute to and enhance the revitalization of the Jackson Boulevard District and the Near West Side area by the infusion of both elderly and family housing into an area that has suffered extensive demolition of existing housing and loss of population in the past, but which is now on the road to recovery.
 
 
 15
 Id. The judge also relied on the undisputed fact that there was then no other assisted housing in the Academy Square census tract, id., and on his own conclusion that, contrary to Intervenors' argument, "the area is * * * a prime site for redevelopment and revitalization now and in the future, regardless of the construction of Academy Square." Id. at 1294 (emphasis added). Finally, the judge pointed out that Intervenors had not shown "how the addition of another 18 units would result in any presumed harm to what they view as the best interest of the community, which would not be equally present in an unquestionably appropriate 82-unit development." Id. at n. 10. The judge did not even suggest that Binford's "promise" that the project or even the neighborhood would be integrated had any bearing at all on his determination that Academy Square was in the best interest of the community. Nor did this Court in affirming the grant of the waiver.[12] Thus both because Binford did not make the promise Intervenors claim and because, in any case, neither the district court nor this Court relied on Binford's alleged promise in deciding to grant the waiver, the decision to grant the waiver provides no basis for granting the relief Intervenors request now.
 
 
 16
 Intervenors also claim that their motion is proper under the original intervention order because, in approving the Consent Decree in 1981, this Court rejected a claim by a plaintiff class member residing in the Hyde Park-Kenwood Revitalizing Area that the Revitalizing Area concept was flawed since the impact of assisted housing on neighborhood stability was not a factor in determining whether a community should be characterized as a Revitalizing Area. See Gautreaux v. Pierce, 690 F.2d 616, 636-637 (7th Cir.1982). We noted that
 
 
 17
 [t]he designation of the Revitalizing Area does not necessitate that "racial tipping" be a consideration. Meaningful evaluation of any potential for racial tipping can be made more effectively at the time a specific project is proposed. HUD's regulations require exactly that, and thus would render superfluous the inclusion of such a criterion before designation of a Revitalizing Area could be made. * * * [A]ny necessary consideration of racial tipping from imminent construction may yet be made by HUD pursuant to its regulations.
 
 
 18
 Id. Intervenors argue that they are pressing the same issue which this Court deferred in 1982 and therefore it would be "grossly unfair now to deny [them the opportunity] to insist that HUD live up to the promises it made in 1982 in order to obtain a waiver." Appellants' Br. 30; see also Reply Br. 8-9. Appellants characterize as on one continuum the plaintiff-class members' 1981 challenge to the criteria for identifying Revitalizing Areas and their own 1982 challenge to the Academy Square project as violating the consent decree's density requirements. They claim that their challenge to the over-dense Academy Square project was in fact a "racial tipping" challenge which this Court rejected as premature and inapt in 1981.
 
 
 19
 However, it has already been established that HUD's waiver was not granted on the basis of any "promise" that the Academy Square project would be integrated, and Intervenors have not shown that they have raised the "racial tipping" argument except in the context of the waiver. Therefore, we reject Intervenors' claim that this Court's statements in approval of the consent decree, coupled with HUD's statements in obtaining the waiver, establish that their motion is within the scope of the original intervention. There is simply no basis under the current limited intervention order for allowing Intervenors to proceed with their claim.
 
 
 20
 Intervenors also contend that their motion is proper under Fed.R.Civ.P. 71, as an effort by third parties to enforce a court order entered for their benefit. However, they cannot prevail under Rule 71 because the consent decree simply was not entered for their benefit. See Gautreaux v. Pierce, 707 F.2d at 273 (Posner, J., concurring). It is clear that the parties to the decree (HUD and the plaintiff class), who reserved the right to modify the decree without even notifying Intervenors, did not intend to give them or others who challenge public housing in integrated communities third-party beneficiary rights under the consent decree. Id. Nor are we persuaded by Intervenors' contention in their reply brief that they were made third-party beneficiaries of the consent decree when the waiver was approved (Br. 10-11 and n. 9). They base this contention on their theory that HUD's "promise" that the project would be integrated was a material condition inserted in the decree for Intervenors' benefit. Intervenors' claims with regard to HUD's "promise" have been rejected already. We note further that intervenors have not provided any support for their bare assertion that HUD's statement, reproduced at note 11, was made to benefit them.
 
 
 21
 Third, Intervenors claim that their motion states a new reason, aside from the original intervention, for allowing them to participate in the Gautreaux lawsuit. They now claim that their own interest in an integrated community which has not "tipped" racially and become predominantly black will be harmed if the proposed marketing plan is implemented. They claim that the marketing plan will result in an all-black Academy Square project, which would in turn cause their census tract's population to be 57% black, 37% white and 6% other.[13] Appellants' Br. 10. They also claim that the district court has authority under the Fair Housing Act of 1968, 42 U.S.C. Sec. 3608(c)-(d), to enjoin this marketing plan and to order implementation of one which imposes racial quotas for Academy Square tenancy. The district judge did not consider these claims which Intervenors first raise on appeal.[14] Instead, he concluded that even with an unlimited right to intervene, the Intervenors could not obtain the requested injunctive relief because it would require review of "the day-to-day managerial and administrative decisions of others charged with implementing the consent decree" and therefore went beyond the scope of the court's duty under the consent decree to supervise the administration of the decree. 101 F.R.D. at 705.
 
 
 22
 Under Alschuler v. Department of Housing and Urban Development, 686 F.2d 472 (7th Cir.1982), Intervenors probably have standing to assert such a claim in some lawsuit, assuming of course that the claim has ripened into a live controversy. Appellees do not seriously contest this. Instead, the only real question is whether or not Intervenors can raise this independent claim by a new intervention in the Gautreaux lawsuit.
 
 
 23
 To raise their "racial tipping" claim in the Gautreaux suit as a matter of right, Intervenors must establish that (1) they have an interest in the transaction which is the subject of the Gautreaux suit; (2) the interest will be impaired, as a practical matter, unless they intervene; and (3) the existing parties to the lawsuit cannot adequately represent that interest. Rule 24(a)(2). Intervenors do not show that they meet these requirements for mandatory intervention[15] but instead argue only that they should be allowed to intervene to save the cost and inconvenience of refiling their motion as a separate lawsuit. We decline to order intervention on this basis.
 
 
 24
 While a showing of inconvenience, cost and delay sometimes may be sufficient to satisfy Rule 24(a)(2)'s impairment of interest requirement, that is not the case here.[16] Allowing intervention with regard to Intervenors' "racial tipping" claim would do little in itself to save time or money for any of the participants in this action, or even for the judicial system. Intervenors contend that the proposed marketing plan is (1) not reasonable, (2) unlikely to result in integration and (3) therefore likely to cause racial tipping. These contentions all require factual determinations properly made by the trial court, as Intervenors themselves admit (Appellants' Br. 43; Reply Br. 21).[17] Thus even if we agreed that Intervenors could raise this independent claim in the Gautreaux suit, we would remand the cause to the district court for further consideration.[18] Refusing to allow intervention effectively would require only that Intervenors refile their motions and supporting documents in another lawsuit which would also be considered by a district judge. Under these circumstances, refusing to allow intervention will cause little if any inconvenience that would not also exist if we allowed intervention.
 
 
 25
 For the above reasons, the district court's memorandum order of March 14, 1984, denying intervenors' motion is affirmed.[19]
 
 
 
 *
 The Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation
 
 
 [1]
 Revitalizing areas are those "having substantial minority occupancy and undergoing substantial physical development" and are identified by census tract number in Exhibit B to the consent decree. 523 F.Supp. at 674, Consent Decree p 2.9. The Consent Decree and its exhibits are reproduced in full at 523 F.Supp. at 672-683
 
 
 [2]
 p 5.8.2(iii) provides in pertinent part:
 
 
 [5]
 8.2 HUD will not reserve contract authority for Section 8 New Construction assisted housing units in the General Area or the Revitalizing Area of the Chicago SMSA in any structure, or in any group of structures on the same or contiguous parcels of real estate, which:
 * * *
 (iii) Is to be located in any census tract if, following such location, the aggregate number of apartments and single family residences theretofore made available under any assisted housing program in such census tract would constitute more than 15% of the total number of apartments and single family residences in such census tract.
 
 
 [3]
 p 8.5 provides in pertinent part:
 
 
 [8]
 5 In any fiscal year in which HUD wishes to approve contract authority for assisted housing that does not conform to the percentages specified in paragraph * * * 5.8.2 hereof, it may approve such contract authority with the written consent of plaintiffs' counsel without obtaining an order from the Court. If plaintiffs' counsel does not consent, HUD may seek a Court Order waiving the provision in question. CHA may seek plaintiffs' counsel's consent or, where necessary, a Court order waiving any of the provisions referred to in this paragraph with respect to contract authority for public housing projects. If HUD wishes to approve contract authority that does not conform to the provisions of subparagraph * * * (iii) of paragraph 5.8.2, it must show, with respect * * * to subparagraph (iii), that approving the contract authority is in the best interests of the community where the assisted housing would be located
 Because plaintiffs' counsel's consent was not even sought before the district court's initial opinion, the court treated counsel's subsequent approval as a joint request for waiver and evaluated the request under p 8.5's "best interests of the community standard." 548 F.Supp. at 1291 n. 4.
 
 
 [4]
 Because intervention and standing issues were not raised on appeal, a majority of the panel refused to consider them. 707 F.2d at 267 n. 2. However, one judge concurred in the majority's affirmance of the waiver on the basis that the intervenors lacked standing to intervene to enforce the consent decree. 707 F.2d at 272 (Posner, J., concurring)
 
 
 [5]
 Attempts by the intervenors to obtain information about the status of the marketing plan, including an interim in camera report submitted to the district court on September 1, 1983, while the marketing plan was being developed had been rejected previously by the district court (August 3, 1983, Tr. 15; September 27, 1983, Tr. 12). On April 19, 1984, after issuing its memorandum opinion denying Intervenors' motion, the district court ordered the in camera report removed from under seal and made a part of the record in this appeal. Thus, since April 19, 1984, Intervenors have had access to this report but, of course, had been unable to use it in arguing before the district court
 
 
 [6]
 Like Lavicka and Piegare, the developers were allowed by the district court to intervene in the class action for limited purposes. 548 F.Supp. at 1287. In the case before us, Intervenors seek to enjoin the actions of the developers as well as HUD with regard to the proposed marketing plan. The district court did not indicate that the developers' participation now is improper, nor has such a claim been made on appeal. Throughout this opinion, Lavicka and Piegare are referred to as "the Intervenors" and the developers are referred to as "the developers"
 
 
 [7]
 Subsequent to oral argument in this appeal, Intervenors filed in this Court an emergency motion contending that black persons had submitted about 95% of all applications submitted for Academy Square housing and seeking from HUD and the developers a detailed report about the racial composition of the Academy Square applicant pool. This relief was determined to be unnecessary for the resolution of this appeal and therefore the motion was denied
 
 
 [8]
 The district court indicated that the Intervenors lacked standing to press their claim in the Gautreaux lawsuit because their requested relief was beyond the scope of the original limited intervention and, indeed, beyond the scope of the consent decree itself. 101 F.R.D. at 705. It is unnecessary to resolve the standing issue in this decision since even if the Intervenors had standing, the district court properly denied their motion because it exceeded the scope of their limited intervention
 There was no claim in the appeal from the original intervention decision, see 707 F.2d at 267 n. 2, nor is there any claim now, that the district court erred in imposing the limitation on intervention, even though the district court determined that the intervention was as a matter of right pursuant to Fed.R.Civ.P. 24(a)(2), see Gautreaux v. Pierce, 548 F.Supp. at 1287, whereas limited intervention generally has been considered in the context of Rule 24(b) permissive intervention. See, e.g., Bradley v. Milliken, 620 F.2d 1141, 1143 (6th Cir.1980); Van Hoomissen v. Xerox Corporation, 497 F.2d 180, 181 (9th Cir.1974); 3B J. Moore, Moore's Federal Practice p 24.16 (2d ed. 1982).
 
 
 [9]
 In fact, the Academy Square neighborhood which Intervenors occupy has confirmed these predictions. The neighborhood, which is near several major institutions (including University of Illinois' Chicago Circle Campus and the City of Chicago's Police Academy) as well as good public and auto transportation routes to the Loop, has seen an increase in white population over the last decade, even though nearby Van Buren Park and Circle Park housing developments are predominantly black. See Dev.Br. 31. Intervenors have only quibbled with the significance of this data without actually refuting it
 
 
 [10]
 This argument is strikingly similar to a Fed.R.Civ.P. 60(b) claim that the waiver should be vacated because of mistake, misrepresentation, or some other good reason. However, Intervenors do not explicitly claim they are relying on Rule 60(b) and, in fact, do not seek relief from the waiver itself despite their claim that it was the result of HUD's promise. Rule 60(b) provides no basis for Intervenors' relief here, because (1) HUD did not make the promise Intervenors claim, (2) the district court and this Court did not rely on the statement Intervenors quote, infra, in granting the waiver, and (3) there has been no material change in facts or applicable law justifying modification of the consent decree or vacation of the waiver since the decree and waiver were entered (see HUD Br. 12)
 
 
 [11]
 Paragraph 9 of Binford's affidavit reads in its entirety:
 
 
 [9]
 In consideration of the above[-mentioned information about transportation, education and medical facilities in the Academy Square neighborhood], I concluded that the proposed project site offers a greatly enhanced living environment for members of the plaintiff class, and that the area, largely non-residential but supported by strong institutions, has a strong potential for providing non-segregated housing opportunities for members of the Gautreaux class. I also considered the fact that, using 1980 census data, the project site is in a Census Tract that would have been designated "General", (due to the fact that its black population does not exceed 30%), but for its designation as a Revitalizing Area
 The last sentence of Binford's affidavit apparently was an attempt to distinguish the Academy Square census tract from other Revitalizing Areas which included black populations in excess of 30% and which, absent substantial physical development, would have been designated "Limited Areas," in which construction of new assisted housing was to be curtailed. See 523 F.Supp. at 679-680, Consent Decree p 5.8.1.
 
 
 [12]
 Indeed, Judge Posner's comments in concurrence criticizing the grant of the waiver lend even more support to our conclusion that, contrary to intervenors' assertions now, the feasibility or likelihood of integration in the Academy Square project and its implication for the community's racial stability were simply not issues before the courts considering whether or not to grant the waiver. Judge Posner disagreed with the district court's and the panel majority's decision that the project would help to revitalize the previously waning community. He concluded that revitalization of the community was unlikely but did not indicate that the project's presence might cause an exodus of only the white area residents. 707 F.2d at 272 (Posner, J., concurring)
 
 
 [13]
 Census figures for 1980 show the population then was 62% white, 28% black and 10% other. Appellants' Br. 10
 
 
 [14]
 Despite their allegations to the contrary, it does not appear that Intervenors made clear to the district court that their January 23, 1984, motion for relief raised an independent basis for intervention. Instead, the materials they now assert "squarely raised" this claim (Appellants' Br. 31) merely sought to challenge HUD's actions in light of the density provisions, a goal within the scope of the original intervention limitations:
 
 
 [13]
 If an all-black occupancy for the Project is permitted to occur, two separate but related violations of the law will result:
 * * *
 B. White residents of integrated, revitalizing areas, like Intervenors--who are committed to living in an integrated inner-city neighborhood--will have been denied the protection against the over-concentration of Assisted Housing that led to the density limitations of the Consent Decree. The express purpose of those protections, the attraction of white residents to "foster racial integration," will have been defeated.
 p 13B, Intervenors' January 23, 1984, Motion for relief (emphasis added). Therefore, Intervenors cannot now complain that the district court failed to give consideration to this claim.
 
 
 [15]
 A decision about whether or not to allow permissive intervention, pursuant to Rule 24(b), is generally within the discretion of the district court. A motion for permissive intervention may be denied where, for instance, it is determined that "intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Rule 24(b). In an earlier phase of this litigation, implicitly in order to keep the Gautreaux suit to manageable proportions and to avoid delay in the original action, the district court denied intervention in cases which could "rise or fall on their own merits without much reference to the consent decree," 548 F.Supp. at 1287. The present motion clearly falls within this class and therefore may not be raised in the Gautreaux suit pursuant to Rule 24(b)
 
 
 [16]
 Each of Rule 24(a)(2)'s requirements must be satisfied before Intervenors may intervene as of right. N.A.A.C.P. v. New York, 413 U.S. 345, 369, 93 S.Ct. 2591, 2604, 37 L.Ed.2d 648 (1973); C.F.T.C. v. Heritage Capital Advisory Services, Ltd., Appeal of Saelens, Inc., 736 F.2d 384 (7th Cir.1984); Wade v. Goldschmidt, 673 F.2d 182, 185 n. 4 (7th Cir.1982). Because we conclude that the impairment-of-interest requirement has not been satisfied here, we do not decide whether Intervenors' claim satisfies Rule 24(a)(2)'s other requirements
 
 
 [17]
 Indeed, it is not clear that the district court even reviewed all the memoranda and affidavits submitted. In its memorandum order the court does not indicate that it had studied the materials submitted, and Intervenors point out that at a meeting with counsel a few weeks before the order was issued, the court explained that it had not read any of the materials filed. Appellants' Br. 8 n. 1
 
 
 [18]
 This Court expresses no opinion as to whether, under the district court's Local General Rule 2.31, the new suit would properly be heard by Judge Aspen, who has supervised the Gautreaux action
 
 
 [19]
 Appellees urge this Court not only to affirm the district court's order but also to reach the merits of Intervenors' claim by deciding that racial quotas may not be imposed at the Academy Square project. We express no opinion as to whether or not such quotas may or should be employed there, because this issue by no means presents a live controversy at this stage of these proceedings. It will be unnecessary to decide this issue, for instance, if the district court determines that the proposed marketing plan is proper. Even if the plan is found to be improper, a remedy other than racial quotas may be found adequate. Under these circumstances, we decline to reach the merits of the racial quota issue